JAMES P. NEWELL, Public Administrator in Charge of Estate of A. J. ODEGAARD, v. BOATMANS BANK, Appellant.

Division One, December 1, 1919.

1. **DORMITORY**: Athletic Club. A seven-story brick building, the west half of which was occupied by an athletic club, having a kitchen and dining room on the third floor, a banquet hall and ten sleeping rooms on the fourth floor, thirty-six sleeping rooms and a library on the fifth floor, thirty-nine bed rooms on the sixth floor, having in all sleeping accommodations for one hundred and twenty-five persons, in which seventy persons were sleeping at the time of the fire, was a dormitory within the meaning of Section 10668, Revised Statutes 1909, and was required to be equipped with fire escapes as provided by Sections 10666, 10667 and 10668.

2. **DEATH IN DORMITORY**: Insufficient Fire Escapes: Proximate Cause: Res Ipsa Loquitur. When fire safety-appliance laws are violated, and death, unexplained except by the physical facts, occurs as a result of fire in a building not equipped with the required appliances, but which is by law required to be so equipped, the case should go to the jury under the rule of *res ipsa loquitur*, although there is no positive evidence that the death was due to a lack of such appliances. Even though there was no physical obstruction between the room in which deceased was sleeping and a near-by exit to a fire escape, unless the fire barred the way, yet if no person sleeping in other rooms opening on the corridor escape by said exit, and there is further evidence from which it may be inferred that had there been

the required appliances at another part of the corridor he might have escaped, the rule applies, and the jury must determine the proximate cause of his death.

3. **NEW TRIAL GRANTED**: Weight of Evidence: Appellate Practice. Where under the facts in evidence the rule of *res ipsa loquitur* required the case to go to the jury, and they returned a verdict for defendant, the action of the trial court, granting to plaintiff a new trial on the ground that the verdict was against the weight of the evidence, will not be disturbed on appeal.

Appeal from St. Louis City Circuit Court.—*Hon. John W. Calhoun*, Judge.

REMANDED FOR NEW TRIAL.

*Lehmann & Lehmann* and *Fauntleroy, Cullen & Hay* for appellant.

(1.) The building was not a hotel or a dormitory, but was a "club house," for which the number of fire escapes should be determined by the building commissioner of the City of St. Louis. Hence the plaintiff in resting his action upon the theory that the building was a hotel or dormitory, proceeded upon the wrong theory and was not entitled to go to the jury. R. S. 1909, secs. 10666, 10667, 10668. (2) There was no evidence proving or tending to prove that the failure of the bank to construct and maintain additional fire escapes was the proximate cause of the death of deceased. The facts themselves show lack of proximate cause. Armaindo v. Ferguson, 55 N. Y. Supp. 769; Radley v. Knepfly, 104 Tex. 130. (3) The facts of this case bring it within the class referred to by this court in the case of Burt v. Nichols, 264 Mo. 1, wherein the court said: "We can readily appreciate a case wherein the facts themselves show lack of probable cause."

*Watts, Gentry & Lee* for respondent.

(1) That the identical building in question falls within the provisions of the statutes which were violated, was held by this court recently in the case of Ranus

v. Boatman's Bank, 279 Mo. 332. (2) Sufficient facts were shown to justify the court in submitting to the jury the question as to whether or not the violation of the statutes was the proximate cause of Odegaard's death. Burt v. Nichols, 264 Mo. 1. (3) This court will defer to the discretion of the trial judge in granting a new trial on the ground that the verdict is against the weight of the evidence.

RAGLAND, C.—John Odegaard lost his life in the fire which destroyed in the early morning of March 9, 1914, the building occupied by the Missouri Athletic Association. He was about thirty-two years of age, had never been married, and left no relatives in this State. Aged parents, dependent upon him for support and to whose support he was contributing at the time of his death, survived him, and were living in the City of Chicago. This suit was instituted by the public administrator of the City of St. Louis, having in charge his estate, and wherein he seeks to recover damages against defendant as owner of the building for having negligently caused the death of his intestate, in that, it had not prior to the fire equipped said building with suitable and safe fire escapes and balconies as required by the statutes of this State. The defendant answered by way of general denial. An affirmative defense was also pleaded, but it seems to have been abandoned.

The building in question was a seven-story structure situated at the northwest corner of Fourth Street and Washington Avenue in the City of St. Louis. The east half of the building up to the third story was occupied by the defendant as a bank, and was fireproof. The remainder of the building was not fireproof, and was occupied by the Missouri Athletic Association for its various club activities. The kitchen and dining room were on the third floor; a large room used for a banquet hall and dancing and about ten sleeping rooms were on the fourth floor; thirty-six sleeping rooms and a library were on the fifth floor; and thirty-nine bed

rooms were on the sixth floor. Some of these rooms were equipped with two beds, so that the sleeping accommodations above the second floor were sufficient for as many as one hundred and twenty-five persons. About seventy persons were sleeping in this part of the building at the time of the fire. Working accommodations were also provided for one hundred and twenty persons above the second floor. There was a three-or-four-story building occupied as a seed store on the west side of defendant's building and immediately adjacent to it; there was a spiral fire escape on the south side on Washington Avenue, near the southwest corner of the building, which connected with landings at openings into the fifth and sixth stories; there was a stair fire escape on the east side on Fourth Street, near the north end of the building, which extended from the seventh floor, and passed windows in each story all the way down; and there was a metal stairway enclosed in a brick shaft outside of the main wall of the building on the north side and adjoining the projecting ell, which extended from the seventh down to the first floor, and with which each story communicated by a door. To get to it from the fifth floor it was necessary to go from a lobby through what was known as the linen room. There was sufficient blank wall on the Fourth Street side near the southeast corner of the building for a fire escape to have been placed there without passing any window.

The alarm was turned in about 1:55 a. m., and the fire chief arrived on the scene approximately three minutes later. He first observed flames pouring out of the windows in the second and third stories on the south and east sides, the heat being more intense on the east or Fourth Street side. About twenty minutes thereafter the entire east wall went down, carrying with it the major portions of all the floors. The north, south and west walls were left standing, and the rooms adjoining the south wall, as well as most of the floor of the corridors immediately adjoining them, remained intact.

The fire must have originated on the floor separating the second and third stories. After it got under headway the central stairway and the central elevator shaft operated as huge chimneys through which masses of flame and smoke shot upward, pouring out in great volumes into the adjacent halls and corridors on each floor. Up and down these corridors men were running to and fro, uttering cries, in vain efforts to escape. No one got out of the building by way of the Fourth Street fire escape, because the flames coming from windows below the sleeping quarters by which it passed made its use impossible. A few found their way out down through the enclosed stairway and some jumped from the windows on the west side on to the seed store roof. Some half dozen persons came down the Washington Avenue escape, but, so far as the evidence discloses, only one from the fifth floor, a man who occupied Room 1, which had a window opening directly on to the balcony leading to the escape.

The accompanying plat shows the plan of the fifth floor. Odegaard occupied Room 2 the night of the fire. It will be observed that the east-and-west corridor, into which his room opened, had two windows at its west end, through which, apparently, a person could go on to the balcony or landing leading to the Washington Avenue fire escape, and that but a few steps would have

# PLAT OF THE FIFTH FLOOR

sufficed to have taken him from the door of his room to these windows. There were double sliding doors between Rooms 1 and 2, but they were kept locked and the occupant of Room 2 had no key. From some hearsay evidence, to which no objection was made, it appears that the door from Room 1 into the corridor was locked at the time of the fire and during its progress. This was probably true. An examination of the plat will further disclose that before the partitions were burned the smoke could not get into the east corridor until it had passed up and down the west corridor and around through the north and the south corridors. In this connection it may be said that the occupant of Room 9 tried the Fourth Street fire escape and found it too hot, then went west in the north corridor running east and west to the west corridor running north and south, at this point he found that he could not go south in this corridor on account of the flame and smoke issuing from the elevator shaft and stairway. Occupants of the sixth floor on the north and west sides experienced similar conditions. The body of the occupant of Room 3 was found just inside the door of his room; it was not burned, but from its appearance he died from suffocation. Room 4 was not occupied.

The deceased was last seen alive, so far as the evidence discloses, when he left the dining room a few minutes after eleven o'clock the night of the fire, stating to friends that he was tired and was going to bed, and bidding them goodnight. After the fire, and when the firemen were able by means of the Washington Avenue fire escape to go into Rooms 1 and 2, which were scorched and burned but still intact, as was the corridor leading to the fire balcony on the west side, they found deceased's watch, jewelry and the clothes that he had worn the previous day placed in the room in the same way that he usually disposed of them on retiring, and the bed had the appearance of having been occupied, but his body was not found in any of these rooms on the south side, nor in the corridor. The evi-

dence does not show where his body was found, but a body that was taken from some part of the ruins was identified as his from certain characteristics it was known to possess, principally that of an enlarged knee joint.

The cause was tried to a jury and a verdict for defendant returned. The court sustained a motion for a new trial on the sole ground that the verdict was against the weight of the evidence. From the order granting a new trial defendant has appealed. For reversal of this order it relies on two propositions: (1) that the building in question was not a "dormitory" within the meaning of Section 10668, Revised Statutes 1909, which prescribed for buildings so used a minimum number of fire escapes, and plaintiff, having based his action upon the theory that it was a dormitory, was not entitled to go to the jury; and (2) that there was no evidence proving or tending to prove that the failure of the bank to construct and maintain additional fire escapes was the proximate cause of the death of deceased, that the facts themselves show lack of proximate cause.

I. The case of Ranus v. Bank, 279 Mo. 332, was to recover damages for a death that occurred in this same fire and on the same ground of negligence alleged here. In that case the same question as to the character of the building was presented as here, and **Dormitory.** after a full consideration we held that the use that was made of the building in part constituted it a dormitory within the meaning of said Section 10668. With that ruling we are entirely satisfied. In that case it was conceded, as it is in this, that the building was not equipped with fire escapes in compliance with Sections 10666, 10667 and 10668, Revised Statutes 1909.

II. In support of its second contention appellant points out "that deceased's room was No. 2; that he was occupying it at the time of the fire, that it was within a few feet of a fire escape, which was accessible

either through the folding doors into Room 1 or through the hall running straight from Room 2 to the balcony at the end thereof; that these rooms and the fire escape and immediate environs were measurably intact after the fire; that the body of Odegaard was not found in his room or at any point between his room and the fire escape." From this it draws the conclusion, "that deceased, with the means of escape at hand, failed to avail himself of them; that not lack of facilities of escape, but failure to use those supplied, caused his death." Appellant is slightly inaccurate in its statement of the facts. It does not appear that the fire escape was accessible to the deceased through Room 1. The sliding doors were certainly locked, and it is probable that the door opening from Room 1 into the corridor was also locked. However, so far as the evidence discloses, unless the fire itself barred the way, there was no physical obstruction between the deceased and the exit to the balcony at the west end of the corridor. What efforts, if any, he made to reach it cannot be known. If any saw him, their voices are also silent. The presumption is that he tried to escape, to live rather than die. It may be that some temporary barrier prevented his leaving the building by this window. It may be that at the time he was aroused and started from his room the smoke and gas and flame, coming through the elevator shaft and stairway, had so filled the south end of the west corridor and the west end of the south corridor that he could not make his way through it, and that the east end of the south corridor and the east corridor were still comparatively free from smoke and gas, in which event he no doubt went east in the south corridor seeking a way out, and had there been a fire escape at the southeast corner of the building attached to the blank wall, or had the one on the east side near the north end been so placed as not to have passed windows, he probably would have escaped. These are possible inferences. One thing is reasonably certain, and that is, that not a single person on the fifth floor escaped

through the exit leading to the fire balcony at the west end of the south hall. The facts of this case bring it squarely within the rule announced in Burt v. Nichols, 264 Mo. 1, viz: "When fire safety-appliance laws are violated and death, unexplained except by the physical facts, occurs by fire in the burning of a building not equipped with the required appliances, but which is by law required so to be, the rule of *res ipsa loquitur* should be invoked to take the case to the jury, where all inferences *pro* and *con* and all matters of contributory negligence can be resolved under proper instructions by the triers of fact." There was evidence, therefore, to take the case to the jury on the issue of proximate cause. Whether their verdict should have been set aside on the ground that it was against the weight of the evidence was a matter that lay wholly within the discretion of the trial court.

The order granting a new trial is affirmed and the cause remanded.

*Brown* and *Small, CC.,* concur.

PER CURIAM:—The foregoing opinion of RAGLAND, C., is adopted as the opinion of the court. All of the judges concur.