H. J. Jenkins v. James M. Kurn and John G. Lonsdale, Trustees of the St. Louis-San Francisco Railway Company, Appellants. —144 S. W. (2d) 76.

Division One, October 31, 1940.*

*J. W. Jamison* and *Mann, Mann & Miller* for appellants.

---

*NOTE: Opinion filed at May Term, 1940, May 7, 1940; motion for rehearing filed; motion overruled June 28, 1940; motion to transfer to Court en Banc filed; motion overruled at September Term, 1940, October 31, 1940.

*Sizer & Myres* for respondent.

906

BRADLEY, C.—This is an action under the Federal Employers' Liability Act (45 U. S. C. A. 51 et seq.) to recover for injuries received when plaintiff, a locomotive fireman, jumped from a moving freight train. The jury returned a verdict in favor of plaintiff for $12,000; motion for a new trial was overruled and defendants appealed.

It is conceded that the cause is properly under the Federal Employers' Liability Act. Plaintiff resided at Enid, Oklahoma, and his run was from Enid to Beaumont, Kansas. July 20, 1937, plaintiff was fireman on a northbound mixed train, No. 630, consisting of 32 freight cars and two coaches. The crew consisted of the conductor, engineer, fireman, and two brakemen. Plaintiff jumped from his engine and was injured in the railroad yards at Winfield, Kansas, about 7:10 P. M. Train No. 630 left Arkansas City, Kansas, 14 miles south of Winfield, about 30 minutes behind freight train No. 1229, and plaintiff knew this. The Santa Fe crosses the Frisco at Winfield, and No. 1229 stopped in the yards at Winfield, and south (we may say) of the Santa Fe tracks. The engine was cut loose and moved over north of the Santa Fe tracks to get water. The freight cars and caboose, belonging to 1229, were left on the main track, and train No. 630 ran into the caboose. The engineer of 630 was killed and plaintiff, as stated, jumped from the engine and was injured.

Plaintiff alleged five grounds of negligence, but the cause went to the jury on the charge that the engineer on No. 630 was negligent "in that after he was notified by plaintiff that the extra train (No. 1229) was standing on said track . . . he failed to immediately apply the air in the emergency to stop said train, which negligence . . . forced plaintiff to jump from said train in order to save his life or some bodily harm." The answer, except admissions, was

a general denial, contributory negligence, and assumption of risk. The reply was a general denial.

Error is assigned (1) on the refusal, at the close of the case, of a demurrer to the evidence; (2) on given and refused instructions; and (3) on an alleged excessive verdict.

Throughout the trial the track, upon which the collision occurred, was referred to, for the most part, as extending north and south. According to plats in evidence, this was not accurate, but it will be more convenient to assume that the track so extended. The track crosses Walnut river about 2500 feet south of the point of collision, and from the river to the Santa Fe crossing (about 1200 feet north of the point of collision), the track is, in form, a reverse S curve. Between the river bridge and the point of collision, west side, were a light plant and a race track. Also, there were several trees along the way, on the west side, and especially in the area between the race track and the railroad track. There was a public road crossing about 500 feet south of the point of collision, and the collision point was at or near the easternmost extension of the second curve of the reverse S.

According to the evidence, the speed of the train, from the river bridge, was 6 miles per hour. The engineer, from his side (right), could not see train No. 1229, especially after train No. 630 entered upon the second curve of the reverse S, and plaintiff testified that he looked all the time straight up the track, and that, because of the first curve, and the obstructions west of the track, he did not see train No. 1229 until within 10 or 15 car lengths (400 to 600 feet) of it. He testified that he first saw the caboose of train No. 1229 when his engine was at or near the public road crossing, which, as stated, is about 500 feet south of the point of collision.

With some omissions and a few supplied words, plaintiff's evidence may be stated as follows: "When I came around there and got away from those trees where I could see around the curve, I saw the caboose, and I then hollered to him (engineer) to push that brake valve over in emergency; that the train was down there in front of us. When you yelled to an engineer to pull the brake valve over, that means danger and to stop. I yelled loud at the engineer. Q. Did he hear you? A. Well, he looked around; he didn't do anything. He looked like he thought I was joking with him or something (this statement stricken). He turned around and looked at me, but he did not throw on the brake valve, and made no effort to do so. Q. What did you do after you yelled at him? A. I got down off my seat box and went on his side; we were drifting on down toward the caboose; I was kind of waiting on him to see what he was going to do. Q. From the time you yelled, how far did you travel until the engineer put on the brake valve? A. Well, we was about, when I got down, when we had traveled down the distance within two or three cars, the best

I can judge, we got in about two or three cars of the caboose, and I started—I went around in the gangway behind him, and started down on the steps, and he pulled the brake valve over in emergency and I went on down the steps and jumped off. Q. Tell me how many car lengths you traveled from the time you gave the signal to throw the brake valve in until you jumped, until the engineer did put on the brake valve? A. Well, I judge that was ten or fifteen cars from where I saw it there to the caboose; looked to me like it was about two or three cars down to the caboose when I jumped off.''

Cross-examination: ''Q. Now you say that when you first saw the caboose you were about at the road crossing or ten or fifteen car lengths from the caboose, what did you do then, when you first saw it? A. I hollered for the engineer to pull the brake valve over in emergency. Q. You don't know whether or not he heard you? A. He looked around, but didn' say anything, and didn't do anything, but I didn't say anything more. Q. Except for looking toward you, he did nothing or said nothing to indicate he understood what you were telling him. A. No. Q. What had you told him? A. I told him to pull the brake valve over in emergency, that a train was standing down there in front of us. Q. Then when he didn't do it, you tell us that you sat there on your seat box until you got down to within about three car lengths of the other train? A. No, I didn't say that. Q. Well, when did you get off your seat box? A. When I told him that, I got down off the seat box, and went over on his side; of course, we were going down about a car length or more and I got off my seat box and went over on his side. Q. The first time you said anything to him you were ten or fifteen car lengths from the caboose? A. Yes. Q. Then you say that he didn't do anything except look toward you and then you got down off the seat box and went over to his side, now how far had your train moved before you got down off your seat box? A. I suppose moved down about a car length maybe, something like that. Q. About forty feet? A. Something like that. Q. Then what did you do? A. I kept waiting for him to do something, kept drifting on down there and he didn't do anything. Q. Is that all you did, just stood there, waiting for him to do something? A. I got down about two or three cars of the caboose and went in behind him, got in the gangway, and about that time he pulled the brake valve over in emergency, and about that time I got down on the bottom step and jumped off. Q. I want to see if I understand you. Where did you go after you had only moved a car length, you say you got off your seat box, what did you do? A. I was down in the deck and I went over toward him. Q. He hadn't done anything and you didn't say anything more to him? A. No, sir. Q. Now, you never spoke to the engineer or hollered to him except the one time when you were on your seat box ten or fifteen car lengths from the caboose, that was the only time you had ever

spoke to him about it, you have already testified you never said another word to him. A. No. Q. And you stood right there behind him while he ran from nine or fourteen car lengths from the caboose down to about three car lengths of the caboose, didn't you? A. Yes, sir. Q. And without ever saying a word to him? A. Yes. Q. And during that time you knew he couldn't see that caboose, didn't you? A. He could see it up to two or three cars when I jumped off. Q. That isn't what I am asking you. From the time you got down in the gangway up to the time you got ready to jump, you knew his view of the caboose and the rest of the cars, of that train, was obstructed? A. Yes, he couldn't see it; when I jumped off, he could see it, though. Court: He means before that. A. No, not before that. (Counsel) Q. Before that he couldn't see it? A. No. Q. You didn't do anything except that first holler to give him any warning at all, did you? A. That is all I did. Q. Did you make any motions with your hands when you did that? A. Well, I don't think I made any motions with my hands, I just hollered to him." Plaintiff testified that the noise of the train did not prevent conversation between him and the engineer when sitting on their respective seats.

Earl H. Felton, head brakeman, testified that, from Arkansas City, he rode "close to the head end" on top of the box car next to the engine; that he saw the caboose of train 1229, and hollered at plaintiff and the engineer, but was unable to attract their attention; that both had "their heads turned to the left" (there was a carnival going on at the race track); that plaintiff got off his seat box "between three and four car lengths from the caboose" and ran "straight across the deck giving this stop signs with his hands like that (indicating) and jumped out of the deck. . . . I jumped right after he did." Plaintiff testified that when the train was south, probably a mile, of Walnut river, Felton was riding on the third or fourth car back from the engine.

The reasons assigned to support the contention that plaintiff did not make a submissible case are that the petition wholly fails to state a cause of action; that there is no substantial evidence that plaintiff gave the engineer a timely warning of the danger; and that plaintiff assumed the risk. Plaintiff's case was submitted on the theory that the engineer failed to exercise ordinary care to stop after notice by plaintiff of the danger ahead. In the situation, the decisive question on the demurrer to the evidence is: Is there substantial evidence that plaintiff *notified* the engineer to go into emergency? It was *possible* for plaintiff's conduct to have been as he testified after he "hollered for the engineer to pull the brake valve over in emergency," but such conduct would certainly not be expected in the usual course. "But the province of the jury to pass on the facts must not be invaded, and however improbable the testimony of the witness who testifies to a fact not in itself impossible may appear in the ordinary course

of events its credibility is for the jury." [64 C. J. 357, sec. 344; Hardin v. Illinois Central R. Co., 334 Mo. 1169, 70 S. W. (2d) 1075, l. c. 1079. See also Weaver v. Mobile & Ohio R. Co., 343 Mo. 223, 120 S. W. (2d) 1105.] ▉ In ruling the questions presented we shall take it that plaintiff used language which it understood would have advised the engineer of the danger when the engine was 10 or 15 car lengths south of the point of collision. The burden was on plaintiff to establish that he *notified* the engineer to go into emergency. He did not so notify him unless the engineer *understood* what was said, and there is not even a scintilla of evidence that the engineer understood what plaintiff said. It is conceded that the engineer could not see train No. 1229 when train 630 was at the public road crossing, or 10 car lengths away or 15 car lengths away, and plaintiff said that he knew this. We think the most favorable evidence for plaintiff would be to say that when train No. 630 was 10 car lengths (400 feet) from the caboose of train 1229, he used the language he says he did about notifying the engineer to go into emergency, and that he did not jump until within 2 car lengths (80 feet) of the caboose. Under this hypothesis, the train moved 320 feet from the time plaintiff says that he notified the engineer before he (plaintiff) jumped. The speed of the train was 6 miles per hour or approximately 9 feet per second. On this basis 35 seconds elapsed from the time plaintiff says that he "hollered for the engineer to pull the brake valve over in emergency," until he, plaintiff, jumped, and all this time the engineer, although in the very jaws of death, did nothing except to turn around and look at plaintiff. Every word of plaintiff's evidence, on the point, tends to show that the engineer *did not understand* what plaintiff said. If the engineer understood what plaintiff said, then there can be no explanation for his failure to act, except that he was determined on suicide. However, there is a presumption against suicide (Hatchett v. United Rys. Co. (Mo.), 175 S. W. 878; Flynn v. Kansas City, etc., Ry. Co., 78 Mo. 195; Newell v. Boatmen's Bank, 279 Mo. 663, 216 S. W. 918; Andrus v. Business Men's Acc. Assn., 283 Mo. 442, 223 S. W. 70, 13 A. L. R. 779), hence there can be nothing in the record tending in the least to show that the engineer *understood.*

It will not be necessary to rule other questions. The judgment should be reversed and it is so ordered. *Hyde* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.