JOE R. PULSIFER ET AL., RESPONDENTS, v. CITY OF ALBANY, APPELLANT.—47 S. W. (2d) 233.

Kansas City Court of Appeals. December 7, 1931.

*Kelly, Bucholz & O'Donnell* for respondent.

*Cook & Cummins* and *F. P. Stapleton* for appellant.

BOYER, C.—The respondents, plaintiffs below, instituted this action to recover for the wrongful death of their unmarried minor son, Lawrence Pulsifer, who died July 29, 1928, from the result of an electric shock received by coming in contact with a transmission wire on July 24, 1928. The suit was instituted against the city of Albany, a city of the fourth class, and the Darlington Electric Light Company. Before submitting the case to the jury, plaintiffs dismissed as to the Darlington Company. Upon evidence offered by both sides the jury found for plaintiffs in the sum of $5000; judgment was entered accordingly, and the city of Albany duly appealed.

The errors assigned and points made in the brief pertain to the action of the court in overruling a demurrer to the evidence; the admission of testimony; the giving of instructions at the request of plaintiffs; the refusal of instructions requested by defendant; and that the verdict is excessive.

There is evidence of the following facts. The city of Albany is the county seat of Gentry County. It is located in the valley on the east side of Grand River. It owned and operated an electric light plant at which place it generated, sold, and distributed electric current to the citizens of that city and to others. The village of Darlington contained about 400 inhabitants and was located in the same valley on the opposite side and down stream about five miles from Albany. In the year 1919, certain citizens of Darlington organized and incorporated the Darlington Electric Light Company for the purpose of procuring electric lights in the village of Darlington. On May 22, 1919, the city of Albany, as party of the first part, entered into a contract with the Darlington Electric Light Company, as party of the second part, by the terms of which the first party agreed to deliver to the second party all the electric current it might require from its electric plant at Albany for a term of twenty years at the price of five cents per kilowatt. It was agreed that the first party should deliver the electric current with sufficient voltage at the point of generation to give a constant voltage of not less than 110 volts at lamp sockets in Darlington, same to be delivered at the city limits of Albany. There was further provision for measuring the current at the city limits of Albany, and it was further agreed that the city of Albany would supply proper poles and lines of wire from its plant to the city limits "to connect at the point aforesaid with a proper line of poles and wire to be constructed with two phase line No. 8 copper wire and which said second party hereby binds itself to construct and properly maintain, during the life of this contract from said Albany city limits to Darlington, Missouri, and to such points beyond as it may desire for the proper conducting of such electric current so to be supplied by the said first party." Then follow these two paragraphs:

"It is further agreed, and is of the essence of this contract that the said electric current, so to be supplied, and to be used at Darlington, Missouri, or in the vicinity thereof or to customers of said Darlington Electric Light Company between the city limits of the said city of Albany and the terminus of the lines of the said Darlington Electric Light Company, is to be carried and conducted at the current loss and risk of said second party, and that said second party will protect the said first party from any damage, loss or harm occasioned by any accident, negligence, or lack of proper care or maintenance of said above described line of poles and wires to be constructed by second party from said city limits of Albany to the terminus of said line at Darlington, Missouri; or within or beyond Darlington, Missouri, in any cause of action for damages or otherwise occasioned by reason of the construction and operation of such said line from the city limits of Albany to its terminus.

"It is further agreed that should the electric lines of said second party be out of order, so that it might be or become dangerous or unsafe to use the same, that the proper officers of said Darlington Electric Light Company, shall notify the proper officers of said first party, if they desire, that for above or any reason, current shall be cut off until such defect be remedied, said first party upon receipt of such notice, will cut off such current, but in that event the minimum rate hereinafter named to be paid to said first party, by said second party, shall not abate by reason of any such stoppage of current for any such or other reasons, not the fault of first party."

There were other provisions not necessary to mention.

It is a fair inference, if not expressly shown, that the Darlington Electric Light Company was not organized and did not conduct its business for profit, but its main object and purpose was merely to create an agency by virtue of which the village of Darlington could obtain light, and that the City of Albany was engaged in producing and selling electric current for profit. It supplied customers outside the city of Albany as well as its own inhabitants. The Darlington company installed its distributing system and built a transmission line of poles and wire from Darlington to the transformer and meter at the city limits of Albany. The line ran through the valley adjacent to the river and across it. At one point the line passed adjacent to and upon the land known as the "Marble farm" and along the west line of a public road at that place which ran north and south on the west side of the river. This point was about two miles from the City of Albany and was the scene of the tragedy. Some years after the transmission line was built a public drainage corporation straightened the channel of the river, and at the Marble farm cut a new channel along the east side of and parallel to the public road which brought the channel of the river much closer the trans-

mission line at that point. The banks of this new channel were finally cut to such an extent that a pole in the transmission line was displaced and slipped down in the channel and lowered the wires attached to it near the ground. Prior to this time the banks of the river had been caving in and a bridge across the river together with a part of the transmission line crossing the river fell in. Some of the poles of the line went down about two or three years before. Mr. Pulsifer, one of the plaintiffs, was lessee of the Marble farm during the year 1928 and previous thereto, and in the season of that year the field adjacent to the river and the transmission line was in wheat. At the time he went to harvest his wheat the lines of wife were sagging in the field over his wheat so that he was unable to cut a part of it. This was early in the month of July. There is testimony that at that time the mayor of the city of Albany was notified of the condition of the transmission line, but this evidence is controverted. The wheat in the field was placed in shocks. Friday evening preceding the accident, which took place on the following Tuesday, there was a heavy rain after which a pole was discovered to be in the river and the wires down. There was evidence that notice of this fact was conveyed to one of the aldermen of the city of Albany, but he denies receiving notice. There was also testimony that one of the operators of the electric plant of Albany was also notified of the condition two or three days before the accident. At the time of the trial he was deceased. There was evidence that the pole was down on Sunday and that on Saturday evening a blaze two or three feet high was observed at or near the place where the pole was down and where the wires were burning brush or vegetation. During the past year the same character of burning had been observed two or three times where the wires were sagging low.

On Sunday the storm had ceased, and the channel was about half full of water. During the afternoon of the following Tuesday, July 24, Mr. Pulsifer in company with one Shelby, his son Lawrence, and another boy, Delbert Fitzsimmons, went to the wheat field for the purpose of scattering the wheat shocks. They entered the field at a point about fifty yards west of the river and the transmission line. The two men were to work together going to the northwest, and the two boys were to work together going to the northeast along the river. As they were about to separate Mr. Pulsifer noticed a short distance ahead of them that the river bank had caved off and let one of the poles of the transmission line slip endwise down the bank bringing the wire near the ground. He says: "I just spoke to them and they went right on, never even looked back or said nothing." They separated and began their work. In about about five minutes the men observed smoke rising near the river and not seeing the boys the men hurried over to the river bank and

there found the boys lying on the ground in contact with the wire. Lawrence had hold of the wire with one hand; Shelby struck the wire with a pitchfork and broke it. The Fitzsimmons boy was dead and Lawrence Pulsifer was unconscious, in which condition he remained until his death on the 29th. It is conceded that both boys met their death by coming in contact with the electric wire. There is no testimony of any eyewitness as to how or why they came in contact with the wire.

There is evidence that the transmission line was improperly constructed and was inadequate and dangerous for the purpose of carrying 6600 volts of electricity which was the measure of the current sent through it; that the poles were too far apart and carried too great a load; that where there were angles in the line there were no guy wires to hold the poles, and that these facts were within the knowledge of the city electrician of Albany some time before the accident. These facts are not denied but admitted. According to his own testimony there was a great strain on some of the poles; that the construction was not proper; that he would not have put an electric wire carrying 6600 volts on the line as it was then constructed, and would not advise any one to do it. He had previously repaired the transmission line and had assisted his predecessor in doing the same when called on to do so by the Darlington company. At one time a repair was made on account of a fallen tree without the knowledge of the Darlington company until after it was done and the bill was sent to it for the service. The bill was paid by a third party who had caused the tree to fall on the wire. The evidence shows that appellant maintained a transformer at or near its city limits through which the current sent over the transmission line was stepped up to 6600 volts; that it passed thence to the Darlington transformer where it was stepped down to the required voltage for use at that place. There was no means or appliance by which the Darlington company could cut the current out of the transmission line, and the only equipment for that purpose was maintained by appellant at or near its transformer at the city limits where the current was cut in or cut off by means of a hand switch. The only other means my which it could be cut off was by means of a switch at the plant which would cut off all current to all lines supplied from the plant. Appellant did not have or maintain any automatic safety switch by which the current would be released on the transmission line in event of the line becoming grounded or in case of disturbance or trouble, and it did not have or maintain any ground detector which would indicate to its employees any disturbance or obstruction or trouble on the transmission line. There was evidence that these appliances were reasonably necessary and were in general

use for protective purposes. Other pertinent evidence will be noted in the discussion of the points raised on appeal in the course of the

## OPINION.

Appellant's first point is that the demurrer to the evidence should have been sustained, first, because the evidence fails to disclose how the deceased came in contact with/ the electric wire; that it may have been accidental or voluntary and it was incumbent upon plaintiffs to show that it was accidental; and second, because the deceased was guilty of contributory negligence as a matter of law.

There was some evidence from which it could reasonably be inferred that the deceased and his companion were at work within close proximity to the wire. One of the wheat shocks was within three or four feet of the wire, according to the evidence most favorable to plaintiffs, and the soil surrounding it was wet and bore evidence that some one had slipped. The shock of wheat was within three or four feet of where the boys were lying either under or in contact with the electric wire. Whether this evidence is sufficient to meet the question raised by appellant is immaterial in our opinion because of the nature of the demurrer and the manner in which the case was submitted to the jury. The demurrer was general. No special demurrers were presented and no withdrawal instructions were requested. The petition alleged several specific grounds of negligence some of which at least were supported by evidence. When the trial court denied the demurrer there was no ruling upon any specific ground of recovery and there was no theory of the case adopted by the court which defendant was required to accept. The plaintiff then offered instructions which were given submitting the case upon several grounds of negligence, and defendant did not request any withdrawal instructions but requested, and the court gave, a series of instructions some of which pertain to the same issues presented in plaintiffs' instructions. Under this situation we are of opinion and hold that defendant is estopped from asserting that there was no submissible case, and that a review of the point that there was no evidence to submit the case upon any theory is precluded. [Torrance v. Pryor (Mo.), 210 S. W. 430; State ex rel. v. Allen, 308 Mo. 487; Soureal v. Wisner, 321 Mo. 920, 928.]

We cannot say that deceased was guilty of contributory negligence as a matter of law. Under the evidence most favorable to the plaintiffs, and reasonable inferences therefrom, we think that this question was clearly one for the jury to be determined under the instructions offered by both sides on the subject. It will not be presumed or inferred that the deceased voluntarily came in contact with the electric wire fully realizing its danger. It may as well be presumed that he intended suicide. A reasonable inference is, from all the

evidence, the surroundings, and the condition in which the deceased was found, that his companion may have first come in contact with the wire and that plaintiffs' son grasped the wire in an effort to aid his companion. Apparently he had taken hold of the wire with his gloved hand. In the absence of the testimony of an eyewitness the presumption would be that of due care and that the injury was the result of an accident.

[Buesching v. Gaslight Co., 73 Mo. 219, 230; Teachout v. Ry. Co. (Mich.), 146 N. W. 241, 244-5; Workman v. Telephone Co., 102 Neb. 191.] Plaintiffs were not required to prove that the contact of deceased with the wire was not voluntary or that deceased was not guilty of contributory negligence. The burden of this issue was upon the defendant. [Clark v. Railroad, 234 Mo: 1. c. 421.]

Under the facts and circumstances shown in evidence the instant case does not fall within the rule announced in Morris v. Kansas City Light & Power Co., 302 Mo. 475, as appellant contends. In that case it was held that the appellant's negligence was not the proximate cause of the injury because it *appeared* that the respondent would not have been injured had it not been for his own negligent act in approaching too near a deadly wire not only with full knowledge of the current of electricity, but with full knowledge of all the surrounding conditions and circumstances. It cannot be so pronounced as a matter of law in the instant case, and the facts and circumstances in evidence distinguish it from the Morris case and others relied upon by appellant. The action of the court in overruling the demurrer was not error.

The next point is that the court erred in admitting incompetent and prejudicial testimony of witnesses Shelby and Smith. They testified to certain statements or admissions made by defendant's agent Hazelrigg, tending to show knowledge on the part of defendant of defects in the Darlington line before the accident. Hazelrigg was the employee of defendant City of Albany, and had been for more than five years. His official position was that of city electrician, and as such he had charge of the distribution of all electricity produced at the plant and had supervision over all the wires carrying electricity out of the plant at Albany, "and the upkeep of the lines and maintenance, and keep all lines working." When .he learned of the accident he was at work on the lines in the city of Albany. The current had been cut off at the plant which eliminated electricity from all lines therefrom. He cut off the Darlington line by means of the switch at the transformer near the city limits in order that the current could be connected with the lines in Albany and not reach the Darlington line. He then went to the scene of the accident accompanied by a helper. He says that he was there "immediately" after the accident; one boy was being carried away and people were

leaving. He carried with him hooks, belts, pliers, and gloves and when he was asked, "Why did you take the tools and rubber gloves," the answer was: "I went to cut that end off so get the end back in shape at the other end, Albany end." One wire was broken, the other was not. He cut the wire which was not broken as well as the ends of the other wire and rolled up about 200 feet of wire. He cut the wire down out of the road on account of the danger and to prevent people from becoming entangled in it. He said: "I thought it best to get it down out of the road." He said he went there as the employee of the city. He was asked what he said while engaged in that enterprise in the presence of Smith and others with reference to knowledge of the condition of the wire on the Marble farm before the accident. He answered: "I don't remember saying anything in regard to the wire on the Marble farm, because I knew nothing of it." On cross-examination and at the instance of defendant he said that he did not know at any time prior to the accident that it was claimed the line on the Marble farm was in bad condition; that he had heard nothing about it at all; that after July 11, he had had no communication of any kind or character with Darlington in reference to their line and knew nothing about the condition of the line from that time to the time of the accident and had heard nothing about it from any one.

Witness Shelby called by plaintiffs was present in the wheat field at the time of the injury and was at the scene when Hazelrigg and his helper arrived and during their stay. He testified that Hazelrigg climbed a pole and cut the wires down; he cut both of them and his helper rolled them up; that Hazelrigg climbed up on the pole and cut the wires down, then the following: "Q. While engaged in that task did he say anything to you? A. Mr. Hazelrigg made the remark as he went up the pole." Here an objection was interposed as follows: "We object to that along the line objected to before—hearsay, not binding on these defendants; no showing made he had any authority to bind either of them." The objection was overruled. The next question and answer are these: "Q. what did he say? A. Why, he just made the remark that they had been notified, Darlington had been notified that their line was in bad shape and they wanted it fixed." The next question was: "What else did he say?" The answer quoted a vulgar remark made by Hazelrigg as to what Darlington could do. A motion was made to strike this testimony "on the ground that there is no showing made that Hazelrigg had at that time any authority to bind either of these defendants by any statement that he might make; that the theory of our thought being he was a mere employee of one of these companies and even at the time the statement was made he was not engaged in the service of his employer and it was in regard to the transaction, if any business

for his employer for which he had been employed, for that reason we think it ought to be stricken out and the jury instructed to disre-. gard.'' The motion was denied. The cross-examination on the same subject by defendant's counsel shows in part these questions and answers: ''Q. Tell what you heard Hazelrigg say when he got on the pole? A. He made the statement when he went up there he says—wait until I tell you exactly—he says they have called us up—they have called us a time or two that their line was in bad condition, and made the remark I made. Q. Wait a minute; he said they have called us a time or two? A. Yes, sir. Q. That that there line was in bad condition? A. Yes, sir. Q. That's what he said? A. Yes, sir. Q. Outside of the other part? A. Yes, sir.''

Witness Smith was the section foreman on a railway nearby and met Hazelrigg and his companion a short distance from the scene of the accident while they were on the return from that place. It was shown that Hazelrigg and his companion were carrying their equipment such as belts, climbers, pliers, and one of them had a small roll of copper wire. Smith was asked: ''Q. Did you have a conversation with Earl Hazelrigg at that time? A. Yes, sir. Q. What was said?'' Objection was made to this question for reasons theretofore urged and was overruled. Then this. question and answer: ''Q. Tell the jury what he said. A. Well, Mr. Hazelrigg said he had notified Darlington about these poles two or three times being down.'' And he was cross-examined as follows: ''Q. Did he mention when he notified them, or what poles? A. No, I don't believe he did, if he did I don't recollect it. Q. You don't know when he said he notified them, or what poles? A. No, sir.''

It is now urged that this evidence of Shelby and Smith was incompetent and highly prejudicial for the reason that the statements of Hazelrigg at the time and place made were not binding upon his employer; ''that he had no authority by his talk to in any manner involve his employer; that he was not engaged at the time of the purported talk on any services for his employer nor in the performance of any duty he owed his employer; that in making this visit to the country, to the scene of this accident, he had abandoned the course of his employment and was at the time on a voluntary mission of his own and that it was hearsay. In other words that it was the mere talk of an employee of the city, about something with which he had nothing to do and the mere expression of an opinion on his part as to a past occurrence, and what he said could not be considered a part of the res gestae.''

The insistence of appellant is based upon the hypothesis that Hazelrigg was a mere employee and an agent of limited authority, and was not qualified to make admissions in reference to knowledge concerning defects in the Darlington line. To sustain this con-

tention appellant relies upon the case of Atkinson v. School of Osteopathy, 240 Mo. l. c. 355, and numerous other cases, all of which have been examined, and in view of all of the facts and circumstances in this case we do not find them applicable or controlling. On the other hand we are inclined to the view and hold as respondent contends that Hazelrigg was a general agent and that he was vested with such authority over a particular line or department of defendant's business as to render evidence of his admissions pertaining to the business committed to him competent' and binding upon the principal. In the case of State ex rel. Life Insurance Company v. Trimble, 310 Mo. l. c. 457, the following is quoted from Wharton on Evidence, with approval:

"As has been already incidentally seen, a party who commits the management of his whole business, or of a particular line of his business, to an agent, is bound by the admissions of the agent, as to his entire business committed to him; nor, when the agent is a general agent, representing his principal continuously, is it necessary for the admission of such declarations that they should either have been part of the *res gestae,* or should have been specially authorized. Eminently is this the case with corporations."

The testimony of Hazelrigg and others is to the effect that Hazelrigg was in complete charge and control of the distribution of all electric current produced by defendant; that he had charge of everything on the switchboard and of all the electrical equipment whether inside or outside of the plant, and supervision of all wires carrying electricity out of the plant at Albany. He described his own duties as city electrician; "the upkeep of the lines and maintenance, and keep all lines working." He also testified that when the current leaves the plant at Albany the way the wires are fixed it travels down to Darlington and the only place where the current can be cut off the Darlington line is at Albany. Other evidence also places this last fact beyond controversy.

Hazelrigg was clearly acting within the scope of his authority when he went to the scene of the accident to ascertain the cause and, as he says, to cut the end of the line in order to get it back in shape at the Albany end and render what assistance he could. He needed no special direction to do this, and in doing it he was about the business of his principal and did not abandon the course of his employment. During the time of his work and on his return therefrom the statements were made. As we see and understand the record, the trial court might well have held that the admissions made by him were in fact a part of the *res gestae.* They pertained to the business in which he was engaged and quite naturally could have been the spontaneous result of the surrounding circumstances at the time. But we are not required to so hold in order to render

the evidence admissible because it is our opinion in this case that in view of the power and authority vested in Hazelrigg and the nature and character of the work which was committed to him, knowledge on his part as to a defect in the Darlington line was knowledge on the part of his principal, and his admissions concerning such knowledge were competent evidence to show knowledge on the part of his employer. The case cited above, the authorities therein mentioned, and others sustain our view. [Klaber v. Fidelity Building Co., 19 S. W. (2d) 758, 763; Laudwig v. Power & Light Co., 324 Mo. 676, 687, and cases cited.]

Other considerations support the view that the admission of the evidence should not be considered reversible error. Hazelrigg had denied that he had any knowledge of the condition of the line and denied he had any communication with any one at Darlington about the line since July 11. There was testimony that the Darlington line was in a condition threatening danger from the 3rd day of July to the date of the accident, July 24th. There is testimony that the mayor of Albany on July 3rd was informed of the sagging condition of the wires on the Darlington line and in the wheat field in question; that there was a heavy rain on July 20; that a witness observed a blue electric blaze on the night of the 21st of July where the electric wires were partially grounded in the wheat and shrubbery. The next day the wires were seen to be down in the field and on the same day one of the city aldermen was informed that the wire was down and the pole in the river. The operator of defendant's electric light plant was also informed of the condition two days before the accident. There was evidence to this effect most of which was denied by the mayor and the alderman, but there was testimony of actual knowledge on the part of the city of a defective condition on the Darlington line, independent of the admissions made by Hazelrigg, in time for the city in the exercise of reasonable care to have disconnected the current to the Darlington line or caused its repair.

Instructions. At the request of plaintiffs the court gave instruction 3 in the following words:

"The court instructs the jury that it was the duty of defendant so long as it retained control, if any, over the electric current from its plant to exercise reasonable care to see that wires over which said electric current was transmitted were in reasonably safe condition to receive said current, and if you find from the evidence that defendant negligently neglected to exercise such care, and that as a result of such negligence, if any, the deceased Lawrence Pulsifer while in the wheat field mentioned in evidence was injured by such electric current, so controlled by defendant, if you so find, from the electric wires mentioned in evidence, and that as a result thereof he thereafter died, and that deceased was exercising such care for his own safety

as would be ordinarily exercised by a boy of his age, intelligence, experience and capacity, and that plaintiffs were thereby damaged, then your verdict must be for plaintiffs."

There were also two other instructions each of which authorized recovery upon the finding of facts contained in them. At the request of defendant the court gave its instruction No. 1 in these words:

"The court instructs the jury that the city of Albany had the right to sell electricity to the Darlington Company, and to deliver it at the meter at the corporate limits. In doing so, if it did, it was not required to inspect the Darlington line to ascertain if it was safe and free from defects. It had the right to assume that the Darlington Company was properly caring for its wires, and had the right to continue the delivery of the current until such time as its officers had knowledge that the Darlington line was unsafe to receive it. So that you cannot find against the City of Albany unless you find from the preponderance of the credible evidence in the cause, that the Darlington line was down and unsafe, and that the City of Albany knew such to have been the fact, and continued to deliver the current into that line after its officers acquired such knowledge."

It is contended that Instruction 3 is erroneous; that it does not state the law in reference to the duty of defendant to exercise reasonable care to see that wires over which said electric current was transmitted were in reasonably safe condition to receive said current; that no such duty is imposed in this case since the city did not own, control or maintain the line on which the accident happened; that there was no duty of inspection on the part of defendant, and the instruction is in conflict with defendant's Instruction 1 which properly declared the law. Appellant treats Instruction 3 as though it placed upon defendant the unconditional duty to exercise reasonable care to see that the line was in reasonably safe condition, but such is not the case. The duty defined is clearly subject to the condition that defendant retained control over the electric current.

We are brought squarely to the question as to whether Instruction 3 states a proper measure of duty and a correct rule of liability under the particular evidentiary facts of this case. The question carries difficulty, partially because of the apparent lack of any guide or precedent in the adjudged cases of our state where a similar question was considered upon a like state of facts. While counsel on both sides cite Missouri authorities said to be analogous and cases from other jurisdictions upon the duty of a generating company which sells and delivers electric current over a line owned and to be maintained by the purchaser, none of such cases presents exactly the same issues raised by the pleadings in this case;

542

nor do they consider the propriety of an instruction similar to No. 3. Part of the charge of negligence contained in the petition is the following:

"That defendants were negligent in that they negligently failed to inspect and examine the said poles, wires and apparatus; that notwithstanding the said defendants were conducting the said electric current along the public highway of Gentry county, Missouri, between the said City of Albany and said village of Darlington, and over, across and along the waters in said Gentry county, Missouri, and the Grand River in said Gentry county, Missouri, and at places where the said defendants knew, and by the exercise of ordinary care, could have known, that plaintiffs' said minor son and other persons were reasonably certain to come in contact with the said electric wires, yet the said defendants negligently neglected to have said wires insulated; that notwithstanding on or about the 20th day of July, 1928, there was a heavy rain in said Gentry county, Missouri, which caused said Grand River to overflow and telephone and electric wires and poles to be thrown from their normal fastenings to and upon the ground and that the effect of said heavy rain was to so prostrate said electric wires and poles upon the ground so as to endanger the life of plaintiffs' son and other persons in the vicinity of the said electrically charged wires, yet the said defendants negligently neglected to make an inspection thereof."

The petition then proceeds to charge negligence on the ground of notice and knowledge on the part of defendants of the defective condition in the line and the failure to make it safe, and further charges that defendants negligently failed to equip the electric light system with proper appliances so that by the exercise of reasonable care defendants would have been immediately warned of the condition of the wires in time to remedy it before the accident. Instructions 1 and 2 given on request of plaintiffs submit the case and authorize recovery upon specific grounds of negligence other than that set out in Instruction 3—Instruction 1 on the ground of the negligent failure to cut off the current after defendant had notice or knowledge of the defect; and Instruction 2 on the ground that defendant failed to exercise reasonable care to equip its system with safety appliances which would make the transmission of current under its control reasonably safe. There is no objection made to Instructions 1 and 2.

To determine whether or not Instruction 3 contains prejudicial and reversible error in requiring defendant "to exercise reasonable care to see that wires over which said electric current was transmitted were in reasonably safe condition to receive said current" we must resort to the admitted or conceded facts and the uncontroverted evidence in the case. The generating company retained

exclusive control over the electric current passing through the transmission wires. The wires were not insulated. The purchaser had no means or appliance or power to cut the current from the transmission line and defendant alone had and maintained the only means at its plant and at its transformer at the city limits by which the current could be turned in or cut out of the transmission line. The transmission line was improperly constructed and had been so maintained for a long period of time; it was inadequate and dangerous to carry 6600 volts of electricity; it was frequently out of repair and in difficulty. Four days before the accident there had been an unusually heavy rain storm; the wires were sagging and a pole had partially slipped in the river thus lowering the wires. It is alleged in the answer that there was a heavy and unprecedented rain, due to which one of the poles of the transmission line was partially lowered on account of an unusual caving off of the bank of the river at said point, and that the condition of the line at said point set out in the petition was caused solely by the unusual, sudden, violent, and extraordinary flood. There is no showing that defendant made any inspection of the alleged defects or made any effort to ascertain the actual conditions prevailing after the storm and before the injury, but continued to supply the transmission line with the current of electricity without any interruption. Defendant contends that under the circumstances it had no duty to use reasonable care to ascertain whether the line was reasonably safe and no duty to make an inspection of any character. It did not have or maintain a ground detector by which it could be notified of any interference or trouble on the transmission line, and it did not maintain an automatic safety switch which would disconnect the current in the event of a positive ground. All of the foregoing facts must be taken as admitted or conceded; they are not controverted. In view of such facts, and wholly independent of any contractual relation between the seller and the purchaser of the current, we think it obvious that a duty to the public arose on the part of the generating company to at least exercise reasonable care to ascertain the condition of the line after the storm, and in the event of a defect to remedy or cause same to be rendered reasonably safe before it continued to send the current through the line. It had agreed to make connection only with a *proper* line of poles and wire which the purchaser agreed to construct and maintain. It was under no duty to furnish current to a transmission line which was in an unsafe condition. Under the facts enumerated, any regard whatever for the safey of the public would demand the exercise of reasonable care, if not the highest degree of care, on the part of defendant to transmit its current in a manner reasonably safe and devoid of danger to any one who might rightfully come in proximity to the line. A rule requiring reasonable care under such circum-

stances to see that the transmission wire was reasonably safe is dictated by reason and the natural instinct of mankind. We need no precedent to declare that such an obligation arose upon the uncontroverted facts evidenced by the record. Regard should be had to the dangerous agency of electricity which defendant undertook to generate and deliver and the extent to which it is understood. It pervades the earth and its surroundings and when captured and confined the natural tendency is to escape and again disseminate. It is a wild beast which cannot be tamed or domesticated. No one should release it without assurance that it will be reasonably confined. The highest degree of care is generally prescribed. We think that Instruction 3 embodies a just and reasonable rule, and while it is not as specific as it might have been in requiring the jury to find that the defendant retained exclusive control, yet no objection is made for that reason and the only objections are centered upon the duty of reasonable care placed upon defendant, and that it is in conflict with defendant's Instruction 1. It is quite true that the instructions are not in harmony, but we think that Instruction 3 was correct and that defendant's instruction does not properly declare the duties of defendant under the facts in the case. The error is in defendant's instruction and not in that of the plaintiffs, and after the court had correctly declared a proper rule defendant invited and obtained an incorrect declaration more favorable than it was entitled to receive and occasioned the error of which it now complains. Whether the jury followed defendant's Instruction 1 or plaintiffs' Instruction 3, the defendant was not deprived of any of its legal rights and we hold that Instruction 3 does not contain reversible error. While not controlling or strictly applicable, the following authorities support our conclusion in reference to the duty of a generating company sending current over a line owned by itself or owned by another, and the duty to inspect after a storm that would likely cause damage because the current and not the wire constitutes the dangerous element. [Fedorawicz v. Electric Co., 246 Pa. 141, 92 Atl. 124; Daltry v. Electric Light H. & P. Co., 208 Pa. 403, 57 Atl. 833; Kentucky & West Virginia Power Co. v. Riley's Admr., 25 S. W. (2d) 366; Lewis, Admr., v. Bowling Green Gaslight Co. (Ky.), 117 S. W. 278; Thomas, Admr., v. Maysville Gas Co., 108 Ky. 224, 56 S. W. 153; Union L. H. & P. Co. v. Young's Admr., 141 Ky. 805; Appalachian Power Co. v. Mitchell, Admr. (Va.), 134 S. E. 558, 561; Hebert v. Electric Co., 120 N. Y. Supp. 672; Hanton v. New Orleans & C. R. Light & Power Co., 124 La. 562; Hoboken Land Co. v. Electric Co., 71 N. J. L. 430; Brown v. Light Co., 137 Mo. App. 718; Blackburn v. Railroad Co., 180 Mo. App. 548; Harrison v. K. C. Electric Light Co., 195 Mo. 606; Geismann v. Electric Co., 173 Mo. l. c. 674.]

Appellant also complains of Instruction 4 given at the instance of plaintiffs in the following words:

"The word 'notice' as used in these instructions, means either actual knowledge or such knowledge on the part of defendant's officers or agents having control over the electric current generated at the defendant's electric light plant, while being transmitted under their control and while engaged within the scope of their employment as would have enabled such officers and agents, by the exercise of reasonable care and caution while so engaged, to know of the condition of the electric wires in or adjoining the wheat field mentioned in evidence, in time by the exercise of such care to have prevented said electric current from injuring deceased."

The criticism of the instruction is that it informs the jury that defendant was bound by knowledge that it could have acquired by inspection and that it is in conflict with defendant's Instruction 1 which informed the jury that the defendant was bound only by actual knowledge. The criticism is substantially the same as that made of Instruction 3. Further, it will be observed that the instruction does not direct a verdict, but that its principal office and function is to define the meaning of the word notice. The only instruction in which that word is used is Instruction 1, authorizing a recovery upon the ground of defendant's negligence to cut off the current if the jury found that defendant had notice or knowledge that the wires were down. As heretofore noted, Instruction 1 is not assailed on this appeal and it is clear that Instruction 4 was designed to supplement or explain the word notice contained in said instruction. In any event, for the reasons stated in the discussion of Instruction 3, we do not regard Instruction 4 sufficiently prejudicial to demand reversal. In the case of Norton v. Wheelock, 323 Mo. 1. c. 927, the following quotation from other cases is adopted.

"Where there is a duty to use diligence, those facts which diligence will discover are presumed to be known under the law of notice; and what one knows and what he ought to know is regarded in law as equivalent."

Defendant's Instruction A was properly refused because it merely presented defendant's theory of contributory negligence and directed the jury to find for defendant if plaintiffs' son knew of the danger and left a place of safety and voluntarily came in contact with the wire. There was no evidence that plaintiffs' son voluntarily came in contact with the wire, and what has been said upon the demurrer in this case is applicable here and there was no error in refusing this instruction.

Instruction D requested by defendant was likewise properly refused because it sought to limit defendant's liability to its actual knowledge that a pole mentioned in evidence had fallen into the river

at the time of the accident. The ruling on Instruction 3 is applicable here and defendant was not entitled to the instruction in the form offered.

Finally it is contended that the verdict is excessive and there is no evidence to support the award. Plaintiffs' son at the time of his decease was one month and twenty-four days past the age of nineteen years. It was shown that he was strong, vigorous, industrious, diligent, obedient, and as fine a specimen of young manhood as could be found in the community. He had been attending high school and it was the hope and expectation of his parents that he continue. He assisted his father in his business of farming and grading operations at various intervals, and at times supervised men employed by his father in such undertakings. He was kept out of school when occasion demanded his help. At one period with the aid of his father's team he earned $7.50 per day in grading work. There was evidence that the total cost and expense of doctors, hospital bills, nurse, and burial expense amounted to approximately $1500. Defendant contends that it was less. This was purely a controverted question of fact for the jury. The verdict was unanimous and met the approval of the trial judge. It was within the special province of the jury guided by the evidence before it to arrive at the total amount of the award. Before interference is permitted and a remittitur required it must glaringly appear that the verdict is shockingly excessive, and plainly the result of passion or prejudice or some other extraneous influence. [Manley v. Wells (Mo. Sup.), 292 S. W. 67, 69.] The presumption is in favor of right action on the part of the jury and the trial judge. We think the verdict is not so excessive as to call for interference. [Klusman v. Harper, 221 Mo. App. 1110, 1114; Walker v. Ry., 253 S. W. 804; Cunningham v. Doe Run Lead Co., 285 S. W. 757; Faulk v. Rys. Co., 247 S. W. 253; Span v. Coal Co., 16 S. W. (2d) 190.] There being no reversible error shown it results that the judgment should be affirmed. The Commissioner so recommends. *Campbell, C.,* concurs.

PER CURIAM:—The foregoing opinion of Boyer, C., is adopted as the opinion of the court. The judgment is affirmed. All concur.