ALICE BORRSON, as Guardian of IDA MAE WHITE, PATSY ANN WHITE and ROBERT JEAN WHITE, JR., minors, v. MISSOURI-KANSAS-TEXAS RAILROAD COMPANY, a Corporation, Appellant.—No. 37799.—172 S. W. (2d) 835.

Division Two, June 7, 1943.

Motion to Modify Opinion Overruled in Per Curiam Filed, July 6, 1943.

230

*Everett Paul Griffin* and *Carl S. Hoffman* for appellant.

*B. Sherman Landau* for respondent.

ELLISON, J.—This is one of three actions under the wrongful death .statute, Sec. 3652, R. S. 1939, Mo. R. S. A., sec. 3652, growing out of a collision between appellant's eastbound freight train and a truck driven by Robert Jean White, with whom his wife, Myrtle Ann White, and their two year old son 'Raymond Arthur White were riding. It occurred on December 20, 1939 at a railroad grade crossing over Caulk's Hill road in St. Charles County. All three truck passengers were killed. In each action there was a judgment for the plaintiff for $10,000, from which the railroad company appealed. One of them was brought by the present respondent Alice Borrson as guardian of the surviving minor children of the couple, for the death of their mother. The judgment in that case was affirmed by Division 2 of this court last May, as reported in 161 S. W. (2d) 227. The same plaintiff brought the instant action, No. 37,799, for the death of the father. The third case, No. 37,798, 351 Mo. 214,. 172 S. W. (2d) 826, was brought by the same Alice Borrson as administratrix of the estate of the infant decedent for his death. These two cases were consolidated for oral argument here, but were tried below separately and are submitted on separate records and briefs. The facts are closely parallel, but there is some difference in them as well as the assignments of error in the briefs, which necessitates the writing of separate opinions.

Respondent's petition contained several assignments of negligence including: failure to maintain watchmen, crossing gates or other

protective devices at the crossing; and negligence under the humanitarian doctrine. But after the evidence was in she abandoned all other pleaded assignments and submitted her case solely on the issue whether appellant's locomotive engineer failed to give warning by bell or whistle for 80 rods until the train reached the crossing, as required by Sec. 5213, R. S. 1939, Mo. R. S. A., sec. 5213. This was, of course, primary negligence, to which contributory negligence of the deceased would be a defense under the express terms of the death statute, Sec. 3652, supra. The appellant's answer pleaded contributory negligence on [837] the part of the deceased in failing to exercise the highest degree of care under Sec. 8383, R. S. 1939, Mo. R. S. A., sec. 8383, by stopping, looking and listening, or by swerving or stopping the truck; also defective brakes on the truck, excessive speed, and failure to heed the railroad crossing sign and to see the railroad track. The first and principal assignment made in appellant's brief here is that the trial court erred in submitting the case to the jury because: (1) the evidence shows the deceased truck driver was guilty of contributory negligence as a matter of law; (2) and there was no substantial evidence that the statutory warning signals were not sounded by the locomotive engineer.

Stating the facts in the light most favorable to the respondent, there was evidence from which the jury might have inferred that the deceased had never been over Caulk's Hill road before. His fifteen year old daughter testified he had not "to her knowledge;" and Mr. Gross, Supervisor for the Farm Security Administration in St. Charles County, testified from a conversation he had with the deceased about two hours before the collision that the latter did not know the location of his destination on the fatal trip. However, it also appears in respondent's evidence that the deceased had been living and farming for 5½ years near New Melle, which the public records of the State Highway Department (of which we take judicial notice) indicate is in the same general part of St. Charles County. Respondent's evidence further shows deceased was an experienced truck driver. Before he began farming he had been a driver out of St. Louis for the Anderson Motor Company, engaged for two years in long distance truck hauling to eastern states and to different (but not all) points in St. Charles County. Prior to that he had been an automobile mechanic.

More important is the testimony of respondent's aforesaid witness Gross as to the purpose of deceased in making the trip. He came to Gross's office in St. Charles about 11 o'clock that morning inquiring where he could buy some live stock. Gross directed him to a farm on Bon Homme island (so-called) which was accessible to truck traffic on the north side of the Missouri River over the Caulk's Hill road and another. In so doing Gross instructed the deceased to take State Highway No. 94 from St. Charles and go southwest

to the village of Harvester, and thence turn left or south following the Caulk's Hill road until he crossed the railroad tracks which were more or less "right at the edge of the upland and bottom land." Then he was to take another intersecting public road running east and west parallel with the south side of the railroad track, and leading to the farm he was seeking. Three times in his direct and cross-examination Gross repeated the statement that he told the deceased the railroad and the parallel east and west highway would be "at the edge" of the bottom land and upland; or where they "connected," or "came together."

The evidence on both sides further shows without dispute that the Caulk's Hill road runs south from Highway 94 and Harvester, and for about 660 feet with a fall of about 146 feet passes through the bluffs or hills on the north side of the Missouri River, to a wide area of flat land called Green's Bottom lying between the river and the foot of the bluffs, with the railroad track hugging the latter. As the road nears the track it is substantially level, but for the last 35 or 40 feet rises to meet the railroad grade. It is an all-weather road of stone or gravel and 16 feet wide. The railroad runs east and west, but on a convex southerly curve both east and west of the grade crossing, and still further west about 1200 feet it curves northerly. The track is on an embankment some 5 or 6 feet above the average level of Green's Bottom. The hill or bluff on the west side of Caulk's Hill road is 175 feet high and covered with trees and dead vegetation, which tend to deaden and deflect over into the river valley the sound of trains coming from the west. Also the hill is so close both to the railroad and the highway that motorists coming down the latter cannot see eastbound trains until fairly close to the railroad track. Witnesses testifying for respondent and appellant gave distance limits of vision westwardly up the railroad track from various positions on the highway, on or north of the grade crossing.

The respondent, who went out to the scene of the collision on January 1, twelve days after it occurred, testified that from a position 23 feet north of the grade crossing she could plainly see a man or train coming from the west down the railroad track, but she did not state how far [838] west. Respondent's witness Hemsath, a neighboring farmer, also testified that when "approaching" the grade crossing from the north along the Caulk's Hill road one could see west "some distance" along the railroad track, the implication being that the distance was 300 feet, but he was not definite about that. Respondent's witness Tony Roth, another local farmer, thought the view west up the track from a point 15 feet north of the grade crossing wouldn't be any more than 300 feet, but said he "couldn't swear to that." He said he couldn't see up the track 300 feet from his

mailbox there, which is the one nearest the track and about 30 feet north therefrom. (See photograph Ex. 6.)

On this same issue as to distance limits of vision respondent produced an expert witness, Major F. W. L. Peebles; and the appellant presented three witnesses who were local farmers, Messrs. Bruns, Heitgard and Kolkmeier. All testified from actual measurements. Also the locomotive fireman, Bagley, testified from observation in the locomotive cab and on the ground. We set out below the figures they gave. The appellant's civil engineer, Roe, gave similar testimony but we do not include it since it was more favorable to appellant:

|  | Distance north of grade crossing | | Distance view westward up track | |
|---|---|---|---|---|
| Peebles | ( 28 | feet | 211½ | feet |
|  | ( 23 | ,, | 275 | ,, |
|  | ( 0 | ,, | 1053½ | ,, |
|  | ( 50 | ,, | 103 | ,, |
|  | ( 40 | ,, | 171 | ,, |
| Bruns | ( 30 | ,, | 229 | ,, |
| Heitgard | ( 25 | ,, | 311 | ,, |
| Kolkmeier | ( 20 | ,, | 749 | ,, |
|  | ( 15 | ,, | 980 | ,, |
|  | ( 10 | ,, | 1026 | ,, |
|  | ( 35-40 | ,, | 135-150 | ,, |
| Bagley | ( 15-20 | ,, | 300-400 | ,, |
|  | ( 40 | ,, | 143 | ,, |

The foregoing testimony of fireman Bagley that the train was 135-150 feet west of the crossing when he *first saw* the truck 35-40 feet north of the crossing, and that he thought he could have seen the truck 15-20 feet north of the crossing when the train was 300-400 feet west thereof, was given at the trial below. He also testified that he later went to the scene of the collision and by actual measurement found he could see a point on the highway 40 feet north of the crossing from a point on the railroad track 143 feet west of the crossing. On cross-examination respondent's counsel elicited from him an admission that about a month before, at the trial for the mother's death, he had testified the train was 300-400 feet west of the crossing when he *first saw* the truck about even with the railroad crossing sign, which was 15 feet north of the track. The witness attempted to explain that he had meant this 15 foot point was where he first realized the truck was *not going to stop*, the engine then being only 135-150 feet westward. And appellant sought to introduce a part of the witness' deposition taken in the mother's case to

corroborate or rehabilitate him on that issue. But the trial court excluded it. At any rate, respondent's brief here assumes the truth of the fireman's testimony that when the train was 300-400 feet west of the crossing he saw the truck 15 feet north thereof, which would mean conversely that the deceased truck driver could have seen the train that far away.

As to the visibility of the grade crossing and track from positions further north on Caulk's Hill road. The railroad X or crossing sign was on an upright post 14 feet high on the east side of the road and 15 feet north of the track (17½ feet north of the center of the track, which was five feet wide). *Respondent* testified she could see the *track* and the crossing sign when 50 feet further north. Her witness Fehr, said he could read the word "crossing" on one of the X boards, and the words "safety first" on the supporting upright post, when 50 feet therefrom. But he said you could not see the railroad rails on the crossing from that distance because of a "little hump" in the highway. He could see the sign from 200 feet up the highway. Her witness Hemsath also testified to the latter fact, saying also "something like several hundred feet." Her witnesses Roth and Ostmann testified to the same distance of 200 feet. And Ostmann admitted he could read the words "crossing" and "safety first" on the X sign and see the railroad track, 50 feet away. All these witnesses for respondent were local farmers. Appellant's three local witnesses Bruns, Heitgard and Kolkmeier testified they could see and read the words on the X sign from much greater distances (which we do not set out).

One of the X boards on the crossing sign was bolted to the north side of the upright [839] post, facing the deceased as he came south on the highway; and had the words "crossing" printed on it. The other board was bolted on the south side of the post and had (or originally had) the word "railroad" printed on the back or north side. That board was split and partly overlapping. Respondent contended at least part of the word "railroad" was covered and had become illegible, in consequence of which the sign was not standard and did not comply with the law. Sec. 8087, R. S. 1929 did require crossing signs of prescribed design, but that section was repealed by Laws Mo. 1939, p. 296, effective September 22, 1939—before the collision here involved. The present Sec. 5214, R. S. 1939, Mo. R. S. A., sec. 5214, does not require crossing signs. So the sufficiency of the sign in this case bears only on the question of deceased's contributory negligence. It is shown in the photographs, Ex's. 2, 5, 6, 7 and 9 hereinafter set out.

Another point on which respondent relies is that Johnson grass 6 to 8 feet high, which had grown up in the summer and had been killed by the winter's cold, yet remained standing on the sides of the railroad right of way up to the ballast and track (but not, of

course, across the Caulk's Hill gravel road and grade crossing). The authority for this contention is the testimony on cross-examination of respondent's witness Fehr, who, as stated, had also testified there was a little hump in the highway just north of the grade crossing, which hid the track from the view of a motorist 50 feet north thereof. Fehr first testified there "could have been grass growing (standing) there" at the time of the collision; that "they just cut that grass here lately;" that "maybe it wasn't cut at that time." Then he started to tell some hearsay he had heard, but was stopped by an objection. Several lines later he said there *was* Johnson grass standing along the track at the time of the collision, but not across the grade crossing. Appellant's witness and section hand, Humphrey, testified he was burning dead grass on the right of way 2½ miles east of the crossing at the time of the collision, including Johnson grass. He further stated the practice was to mow the grass before seeding time and to burn the undergrowth in the winter. From all this respondent asserts there was substantial evidence that this dead grass was standing when the collision occurred, and hid from the deceased's view the railroad track on an embankment 5 or 6 feet high east and west of the crossing; and since he could not see the track over the crossing because of the hump in the highway; therefore he was unaware that he was approaching a grade crossing.

Respondent's photographs (later set out) do not show any such grass obstructing the view of a motorist approaching from the north. Two of these, Ex's 2 and 3, were taken on January 1, 1940, twelve days after the collision, showing snow on the ground which had fallen three or four days after the collision. Respondent's counsel argues the Johnson grass may have been cut or burned off during that 3 or 4 day interval. He announced during the trial that he did not know when it had been cut. Strangely, no witness who went to the collision when or shortly after it occurred was asked about the standing dead grass. But respondent's photographs Ex's 5 and 8 taken later on March 10, when there was no snow, showed dead grass still standing on the right of way at some places, but none obstructing a motorist's view. When the photographs were introduced appellant's counsel objected to Ex's 2 and 3 because they did not depict conditions as they were at the time of the collision, in that they showed snow on the ground. The trial court said: "Let the testimony show that it (Ex. 2, the picture then offered) does differ from the condition at the time of the accident by the fact that there is snow." Respondent's counsel said he would agree there was snow on the ground when the picture was taken, but none when the accident occurred. If he thought the pictures differed from the actual scene at the time of the collision *otherwise* than because of the snow, he did not say so but accepted the benefits of the court's order. Indeed, he was vouching for the accuracy of the photographs because he intro-

duced them without any reservation except as just stated.

Another thing the photographs Ex's 2 and 9 show, is that there is a fairly level space in the angle between the track and the west side of the Caulk's Hill road to which a truck might have swerved. In fact two motor vehicles are shown parked there in Ex. 2. Respondent's witness Hemsath and appellant's local witness Bruns said that for 30-50 feet before reaching the track this space was available for that purpose though "the least bit lower" than the gravel roadway. Hemsath had actually done that [840] once when a train was coming. Her witness Roth had parked his car in that space while getting his mail from his mail box which is about thirty feet north of the track. Respondent's contention was that this open space may have been occupied by one or both of the parked motor vehicles shown in the photograph Ex. 2 at the time of the collision, and he showed that their owners frequently left them there, arguing therefrom that this may have prevented the deceased from swerving into that space. But there was no evidence from any witness present at the time and scene of the collision that the vehicles then were parked there. The deceased could not have swerved the truck to his own (left) side of the road because of the lateral ditch and mail boxes on that side (see photographs Ex's No's 2, 6 and 9).

Respondent's witnesses Hemsath, Roth and Ostmann testified that even close to the track it was difficult or impossible to hear a train approaching from the west because the sound was cut off and deflected by the bluff. Appellant's local witnesses Bruns, Heitgart and Kolk-meier, who had made a test on October 16, 1940, said they could hear an eastbound train whistle when they were on Caulk's Hill road 337 feet north of the crossing; and could hear the train rumble when they were 50 feet from the crossing. Respondent's witnesses Hemsath, Roth and Ostmann also testified they "always" or "generally" stopped or drove slowly when approaching the track, because they knew a railroad crossing was there and that sight and sound were obstructed by the bluff.

The respondent's photographs, Ex's 2, 3, 5, 6, 7, 8 and 9 follow.

Plaintiff's Exhibit 5

Plaintiff's Exhibit 6

Plaintiff's Exhibit 7.

Plaintiff's Exhibit 8.

Plaintiff's Exhibit 9

In Ex's 2 and 3 the ditch spanned by the small railroad bridge is $3\frac{1}{2}$ feet deep according to the estimate of one witness and $5\frac{1}{2}$ feet according to another. The views shown are to the south. The wrecked vehicle in the ditch belonged to the deceased, but had been pushed into it sometime after the collision. Exhibit 5 shows the "hump" in the highway, the X sign and a telegraph pole in the forefront, the latter being about 15 feet north of the track, the same as the X sign. The photograph looks east. Ex's 6 and 7 look west across the highway. The two switches or stakes stuck in the ground on the near or east side of the gravel roadway mark distances respectively 23 and 28 feet north of the track, from which respondent's expert, Major Peebles made his observations of the distance limit of vision westward along the track. Ex. 8 is a straight view west and shows also the parallel highway south of the railroad which the deceased was going to take. Ex. 9 looks north up the Caulk's Hill road, whence the deceased had come. The residence to the left was that of Tom Gregory, who had died before the trial.

The casualty occurred about 1 P. M. on a clear, bright, cool but pleasant day. There were no eyewitnesses to the actual collision, but fireman Bagley in his position on the left or north side of the locomotive cab testified he saw the truck approaching the crossing at a uniform speed of 12 or 15 miles per hour. The train

was going 40 miles per hour. All the train crew agreed to that speed. The right or west window of the truck cab was closed and the two-year-old child was on that side. The fireman could not or did not see the mother and father, the latter being on the far or east [844] side of the truck. He watched and concluded the truck was not going to stop, so he shouted to the engineer, but the latter did not hear him, or at least did nothing. Then he jumped to the "deck," or cab floor, and called to the engineer, again. This change in position prevented the fireman from seeing the truck and locomotive collide. The whole catastrophe began and ended in about three seconds. The engineer applied the brakes when the locomotive was substantially a car's length from the crossing. The train came to a stop in 1400 or 1500 feet and backed up so the caboose was at the crossing; and the mother and child, still living, were taken to St. Charles.

Appellant's witness Bruns, a farmer, was in his field about 150 yards southeast of the crossing. He saw the train and the truck both approaching the crossing, the train 200 or 250 feet back (in the mother's case he fixed this distance at 600 or 700 feet) and going 35-40 miles per hour; and the truck about 100 feet back and going 15-20 miles per hour. The truck continued at that speed until it was a few feet from the track, when the locomotive had reached the highway. But Bruns did not see the collision because his team became frightened and he had to check them. Appellant's automobile expert Lyon testified a truck of the type involved could be stopped in the following distances when traveling at the following speeds:

| Miles per hour | Stopping distance |
|---|---|
| 10 | 5 feet |
| 12 | 7.4 " |
| 15 | 11.5 " |
| 20 | 20.5 " |

The train completely wrecked the truck and the body of deceased was found lying in a parallel ditch about 35 feet north of the track and perhaps 100 feet east of the crossing. But the truck was not thrown very far. It came to rest upside down on the east side of the highway, and later was pushed into the ditch in the position shown in the photograph Ex. 2. Witness Ostmann testified that "a couple of us fellows" discovered a tire mark in the highway about three feet from and parallel to the north rail of the track, leading to the left or east. They thought it had been made by the left front wheel of the truck when it was struck by the locomotive. Just after the collision the engineer examined the locomotive and found marks on the left side of the pilot about 18 inches back from the edge of

the extreme front end of the footboard and about six or eight inches above the ground. These indicated it had struck the truck at that point or the truck had struck it. This part of the pilot projects about 18 or 20 inches outside of the track. Appellant contends from this evidence that the truck ran into the side of the locomotive pilot; respondent asserts the locomotive ran into the truck. We think it makes no difference which way the contact was made; and that the question of the deceased's contributory negligence is governed by broader considerations.

Getting back now to respondent's theory of the case as a whole. In her brief respondent's counsel discusses the question that confronted him at the close of the evidence—whether he should submit the case on the humanitarian doctrine, or on Sec. 5213, supra, requiring warning signals for 80 rods before reaching the crossing. He says he thought the evidence would support a verdict on either theory. But we know, as of course he did, that under the humanitarian theory it would have been incumbent on respondent to show by substantial evidence that the locomotive crew saw or should have seen the truck in a position of imminent peril in time to have averted the collision by some action on their part. The hill hiding the highway permitted only a limited view of the approaching truck, thereby shortening the time for action by the locomotive crew. If he chose the other theory and relied on primary negligence in failing to give the statutory crossing signals that close question would be eliminated; but he would be forced to meet the defense of contributory negligence. As he says in his brief, he voluntarily chose the latter course in this case (and in the other two as well).

But with respect to contributory negligence the law is stricter against the driver of a motor vehicle than against a guest riding therein. Under Sec. 8383, supra, he must use the highest degree of care, whereas a guest need exercise only ordinary care in the circumstances, and may reasonably rely on the vigilance of the chauffeur. There are several decisions holding evidence which would convict a chauffeur of contributory negligence as a matter of law, will not do so in the case of a guest. State ex rel. Alton Rd. Co. v. Shain, 346 Mo. 681, 692(8), 693(9), 143 S. [845] W. (2d) 233, 238(9), 239(14). Furthermore, as held in the mother's case, supra, 161 S. W. (2d) l. c. 230, there was no evidence that she was guilty of contributory negligence. She may have been asleep or tending to her child, or it may be she did warn the deceased and he failed to give heed. And of course the two-year-old child could not be guilty of contributory negligence. But it was the *duty* of the deceased to be vigilant.

Confronted with the law and facts as they are, respondent's counsel seems to take two positions in his brief, one technical and one factual. The first assumes appellant's theory is that the truck failed

244

to stop, but continued with undiminished speed until it ran into the *side* of the locomotive pilot. Then the brief proceeds to argue from the facts that the truck *did* stop, but partly *in front* of the engine. Appellant does make the contention stated, but that is not all of it. Appellant's full contention is that the deceased failed to stop on the highway or in the space at the right thereof, *in time to avert the collision.*

Respondent's second contention, on the facts, is that the deceased was suddenly confronted by an emergency caused by the sudden and unexpected appearance of the swiftly moving but silent freight train and thereby confused, in consequence of which he made the mistake of *trying to stop* instead of continuing on across the track before the locomotive reached the crossing. She further asserts that if the engineer had sounded the statutory crossing signals the deceased would have heard them and could have stopped in time. In arguing that the deceased could have outstripped the train, respondent adopts the testimony, respectively, of appellant's witnesses fireman Bagley and farmer Bruns in the mother's case, that the train was 300-400 or 600-700 feet west of the crossing and was traveling 40 or 35-40 miles per hour; that the truck was 150 or 100 feet north of the crossing and traveling 12-15 or 15-20 miles per hour. On these figures he demonstrates mathematically that the truck could have cleared the track if it had kept on going. To show that the truck could have stopped in safety if the statutory signals had been sounded, she adopts the testimony of appellant's automobile expert Lyon that at the several stated speeds the truck's stopping distance would have been from 7.4 to 20.5 feet; and she further proved by her own witness Ida Mae White that the brakes on the truck were in good working order.

In support of these contentions respondent lays down several legal propositions and cites authority in support thereof. One is that the testimony of the appellant's witnesses fireman Bagley and farmer Bruns in the separate action for the death of the mother, 161 S. W. (2d) 227, supra, was substantive evidence of the facts in the instant action, and not mere impeachment. On this point Pulitzer v. Chapman, 337 Mo. 298, 317(3), 85 S. W. (2d) 400, 410-411, is cited. It is true the mother's case was between the same parties as this; that they were, as it happens, represented by the same counsel; and that the same general facts were involved. But it was a different cause of action and case. The doctrine announced in the Pulitzer case was expressly limited to prior inconsistent statements made by a witness in a deposition in the *same* case. We say that only by way of clarification and to show the Pulitzer decision, as our case law now stands, is not authority for respondent's contention. In our opinion, however, it makes no difference in this case whether the testimony be considered substantive or mere impeachment, since respondent assumes its truth.

■ Respondent further argues there is a legal presumption the deceased would have heeded the statutory warning signals if they had been sounded.[1] There is such a procedural presumption of fact in the absence of evidence to the contrary. But if there be substantial controverting evidence, as that the signals could not have been heard or otherwise would have been ineffective (see proviso, Sec. 5213, supra); or there is conflicting evidence as to whether they were sounded, and further evidence that the highway traveler did not heed them if they were given; then the presumption, as such, disappears and the case goes to the jury on the issues of fact. However, we do not question that the respondent made a prima facie showing on her case in chief of appellant's failure to sound the statutory signals, as was held in [846] the mother's case, supra, 161 S. W. (2d) l. c. 231, on similar evidence. For that reason we do not set out in this opinion the evidence on that issue. But even though the appellant's locomotive engineer failed to give the statutory crossing signals, that did not license the deceased to approach the blind crossing heedlessly, if he knew it was there. We discuss that question in the fifth and succeeding paragraphs.

■ Respondent further contends there are presumptions: (1) that the deceased was not negligent but was exercising requisite care; (2) and that he did not intend to commit suicide.[2] Speaking first of this second contention, there can be no question about suicide in this case and there is, therefore, nothing to make the presumption against it applicable. Suicide means voluntary, intentional self-destruction, 40 Words & Phrases (Perm. Ed.) p. 625 et seq. There is no pleading, evidence or contention of any sort even suggesting that the deceased may have meant to kill either himself, or his wife or two-year-old child. We note in passing, however, that the presumption against suicide, strong as it is in view of the biological fact of love of life, alone is not sufficient to take a case to the jury when all the evidence is convincingly to the contrary.[3]

[1] Citing several cases, including: Berry v. K. C. Pub. Serv. Co., 341 Mo. 658, 671(3), 108 S. W. (2d) 98, 104(7); Gann v. C., R. I. & P. Ry. Co., 319 Mo. 214, 226 (1), 6 S. W. (2d) 39, 43; Toeneboehn v. St. L.-S. F. Ry. Co., 317 Mo. 1096, 1113, 298 S. W. 795, 802(11, 12).

[2] Citing: Wolf v. N. Y. C. & St. L. Rd. Co., 347 Mo. 622, 629 (20), 663-4, 148 S. W. (2d) 1032, 1034(3), 1037(8); Jenkins v. Kurn, 346 Mo. 904, 910, 144 S. W. (2d) 76, 79; Darby v. Henwood, 346 Mo 1204, 1210(1), 145 S. W. (2d) 376, 379; State ex rel. City of St. Charles v. Haid, 325 Mo. 107, 120, 28 S. W. (2d) 97, 102(10); Cech v. Mallinckrodt Chem. Co., 323 Mo. 601, 610, 20 S. W. (2d) 509, 511(4).

[3] Brunswick v. Std. Accident Ins. Co. (banc), 278 Mo. 154, 172-5, 213 S. W. 45, 50; 7 A. L. R. 1213; Andrus v. Business Men's Accident Assn., 283 Mo. 442, 453, 223 S. W. 70, 74, 13 A. L. R. 779; Griffith v. Continental Casualty Co. (banc), 290 Mo. 455, 462, 235 S. W. 83, 85; Id., (banc), 299 Mo. 426, 444-5, 253 S. W. 1043, 1048; State ex rel. Bowdon v. Allen (banc), 337 Mo. 260, 268-9, 85 S. W. (2d) 63, 67(3-4); Gilpin v. Aetna Life Ins. Co., 234 Mo. App. 566, 577-9, 132 S. W. (2d) 686, 692-4(1-6).

Much more should this be true of the other presumption invoked by respondent, namely that the deceased was exercising *due care*. For, while it is said in a few cases that this presumption also is based on the natural instinct for self-preservation[4]; yet we cannot ignore the facts of life in the one instance any more than in the other. And it is common knowledge that the average person frequently is negligent; very seldom with any thought of suicide; and more often than not without adverse results. There are many conflicting decisions on the presumption. Some say it is indulged ex necessitate,[5] and that it can be dispelled only when there is eyewitness testimony to the contrary.[6] Several have gone so far as to hold that even where there are eyewitnesses, the presumption will remain unless they saw the particular culminating negligence of the deceased.[7] (That is respondent's contention here, because the two eyewitnesses, Bagley and Bruns, did not see the actual collision.) And there are at least three cases which seems to hold the evidence destroying the presumption must appear in the plaintiff's [847] own case, since the burden of proving contributory negligence rests on the defendant.[8]

But the doctrine of these decisions that direct eyewitness testimony is required, and their implication that the presumption cannot be overcome by circumstantial evidence, is outweighed by rulings in many others where the deceased was convicted of contributory negligence *as a matter of law* on circumstantial evidence showing that *he* could have seen, heard or done, as deduced from what wit-

---

[4]Mockowik v. K. C., St. J. & C. B. Rd. Co., 106 Mo. 550, 571, 94 S. W. 256, 262(4); Stotler v. C. & A. Ry. Co., 200 Mo. 107, 146, 98 S. W. 509, 521; Cahill v. C. & A. Ry. Co., 205 Mo. 393, 404, 103 S. W. 532, 535; See also Zickefoose v. Thompson, 347 Mo. 579, 591(6), 148 S. W. (2d) 784, 790(7), where the danger was so obvious and imminent as to make the act seem suicidal.

[5]Tetwiler v. St. L., I. M. & S. Ry. Co., 242 Mo. 178, 191, 194, 145 S. W. 781, 783, 784; Burge v. Wabash Rd. Co., 244 Mo. 76, 95, 148 S. W. 925, 930; Wolf v. N. Y. C. & St. L. Rd. Co., supra, 347 Mo. l. c. 634, 148 S. W. (2d) l. c. 1037, decided on the law of Illinois.

[6]Petty v. H. & St. J. Ry. Co., 88 Mo. 306, 320; Cech v. Mallinckrodt Chem. Co., supra, 323 Mo. l. c. 610, 20 S. W. (2d) l. c. 511(4); Keeter v. Devoe & Raynolds, Inc., 338 Mo. 978, 989, 93 S. W. (2d) 677, 682-3; Whiteaker v. Mo. Pac. Rd. Co. (Mo. App.), 15 S. W. (2d) 952, 953(1); Pulsifer v. City of Albany, 226 Mo. App. 529, 536, 47 S. W. (2d) 233, 236(5).

[7]Weller v. C., M. & St. P. Ry. Co., 164 Mo. 180, 198, 64 S. W. 141, 146; Riska v. Union Depot Rd. Co., 180 Mo. 168, 188-9, 79 S. W. 445, 449; Tetwiler v. St. L., I. M. & S. Ry. Co., supra, 242 Mo. l. c. 191, 145 S. W. l. c. 783; Thompson v. St. L.-S. F. Ry. Co., 334 Mo. 958, 976-7, 69 S. W. (2d) 936, 946.

[8]O'Connor v. Mo. Pac. Ry. Co., 94 Mo. 150, 157-8, 7 S. W. 106, 108; Goff v. St. L. Transit Co., 199 Mo. 694, 706, 98 S. W. 49, 52, 9 L. R. A. (N. S.) 244; Toeneboehn v. St. L.-S. F. Ry. Co., supra, 317 Mo. l. c. 1113, 298 S. W. l. c. 802(10).

nesses at the scene did see or hear.[9] Furthermore the force and effect of this presumption has been considered in three recent decisions.[10] The Alton case cites several decisions holding the presumption is merely procedural, and a great many which declare it "is indulged only *in the absence of evidence to the contrary.*" The Dove case holds the jury cannot be instructed about it. And the Thompson case reviews a number of decisions, analyzes the presumption, and reaches the conclusion that it is rebuttable and disappears upon the introduction of substantial evidence by *either* party. The holding of this decision, in effect, is that whether the casualty results fatally or not, the plaintiff starts with the *procedural* presumption of due care in his favor, and the defendant has the burden of proving contributory negligence, which issues must be submitted to the jury unless the plaintiff's own evidence or evidence that he expressly or tacitly accepts as true, establishes that defense as a matter of law.

In short, the plaintiff's decedent needs no special presumption of due care as against the defense of contributory negligence, because the defendant carries the burden of *proof* on that issue and the plaintiff ordinarily can go to the jury thereon without presenting any evidence at all. This is not true of defenses that the death was *solely* caused by the negligence of the deceased or an independent third person, since they are not affirmative defenses. But even then a prima facie showing of the defendant's negligence ordinarily will take the plaintiff's case to the jury unless he treats the defendant's evidence as true and there are no reasonable inferences to the contrary. Wendorf v. Mo. State Life Ins. Co., 318 Mo. 363, 369(1), 1 S. W. (2d) 99, 101. In all such cases, however, it is incumbent on the defendant to prove any pertinent facts peculiarly within his knowledge.[11] To that extent a burden is cast on him ex necessitate.

[9]Stepp v. C., R. I. & Pac. Ry. Co., 85 Mo. 229, 236; Hayden v. M., K. & T. Ry. Co., 124 Mo. 566, 573, 28 S. W. 74, 75; Lane v. Mo. Pac. Ry. Co., 132 Mo. 4, 27, 33 S. W. 645, 652; Huggart v. Mo. Pac. Ry. Co., 134 Mo. 673, 679-680, 36 S. W. 220, 221; Schmidt v. Mo. Pac. Ry. Co., 191 Mo. 215, 232, 90 S. W. 136, 139; Higgins v. St. L. & Sub. Ry. Co., 197 Mo. 300, 317, 95 S. W. 863, 866(3); Stotler v. C. & A. Ry. Co., supra, 204 Mo. 1. c. 632, et seq., 103 S. W. 1. c. 5 et seq.; Rodan v. St. Louis Transit Co., 207 Mo. 392, 410-12, 105 S. W. 1061, 1066(c); Burge v. Wabash Rd. Co., supra, 244 Mo. 1. c. 94, 148 S. W. 1. c. 929-30; Stack v. General Baking Co., 283 Mo. 396, 420, 223 S. W. 89, 97(20); Sullivan v. A., T. & S. F. Rd. Co., 317 Mo. 996, 1008, 297 S. W. 945, 949(3).

[10]State ex rel. Alton Rd. Co. v. Shain (banc), supra, 346 Mo. 1. c. 693, 143 S. W. (2d) 1. c. 239; Dove v. A. T. & S. F. Ry. Co., 349 Mo. 798, 803(2), 163 S. W. (2d) 548, 550(3-5); State ex rel. Thompson v. Shain (banc), 349 Mo. 1075, 1083(3), 163 S. W. (2d) 967, 972(8).

[11]Schneider v. Maney, 242 Mo. 36, 43, 145 S. W. 823, 824(6); Davenport v. King Elec. Co., 242 Mo. 111, 122, 145 S. W. 454, 456(3); Emory v. Emory (Mo. Div. 1), 53 S. W. (2d) 908, 913(7); Haycraft v. Haycraft (Mo. App.), 154 S. W. (2d) 617, 622(11); Guthrie v. Gillespie, 319 Mo. 1137, 1146(6), 6 S. W. (2d) 886, 890(7).

But that rule is not limited to death cases; and the defendant is not required to adduce facts which are unascertainable or unknown, unless they be essential to his own prima facie case.

So we conclude the respondent here had no presumption in her favor of due care on the part of the deceased, after the appellant had presented substantial evidence of his contributory negligence. But nevertheless, to sustain its demurrer to the evidence, we must find all the evidence as a whole was of the controlling and convincing character stated above. Respondent contends the deceased had a right [848] to assume the appellant's locomotive engineer would not violate the law by failing to give the statutory crossing signals, citing State ex rel. Q., O. & K. C. Rd. Co. v. Trimble (Mo. Div. 1), 254 S. W. 846, 849, but in that case it was impossible for the plaintiff to see the train when he was practically entering its path, after he had carefully stopped, looked and listened before. An effort is also made to distinguish some of the later cases cited by appellant,[12] on the ground that their facts showed the injured party was familiar with the crossing involved, or that there was a long, clear view of the approaching train and track. But the law is well established that a railroad track itself is a warning of danger, and that a highway traveler must exercise care commensurate with the circumstances— a motorist, the highest degree of care. If his view is obstructed, he must do whatever is necessary and possible to safeguard himself—by having his car under control, slowing up, stopping, listening, and continuing to look until he can see, even up to the crossing.[13] He cannot depend on a presumption and yet be guilty of negligence, himself.

Under these decisions, in several of which the distances, speeds or limits of vision were comparable to those here, the real question is whether the deceased truck driver knew he was approaching a railroad crossing. In determining that question we must look to respondent's evidence. Her own proof shows that the deceased was following routing directions given him two hours before by respondent's witness Gross. The latter had told him he would come to a

---

[12]Fitzpatrick v. K. C. S. Ry. Co., 347 Mo. 57, 68, 71, 146 S. W. (2d) 560, 565-6, 567-8; Scott v. Kurn, 343 Mo. 1210, 1214-15, 126 S. W. (2d) 185, 187(4); Herring v. Franklin, 339 Mo. 571, 575, 98 S. W. (2d) 619, 621(1); Garner v. St. L.-S. F. Ry. Co., 338 Mo. 257, 263(II), 89 S. W. (2d) 947, 950(II); Rowe v. St. L.-S. F. Ry. Co. (Mo. App.), 41 S. W. (2d) 631, 634; Evans v. Ill. Cent. Rd. Co., 289 Mo. 493, 501, 233 S. W. 397, 399.

[13]State ex rel. Maclay v. Cox, 320 Mo. 1218, 1224-5, 10 S. W. (2d) 936, 942; Herring v. Franklin, supra, 339 Mo. l. c. 576, 98 S. W. (2d) l. c. 621-2 (1); State ex rel. K. C. So. Ry. Co. v. Shain, 340 Mo. 1195, 1201 (3), 105 S. W. (2d) 915, 918(7); Scott v. Kurn, supra, 343 Mo. l. c. 1214-5, 126 S. W. (2d) l. c. 187(4); Poague v. Kurn, 346 Mo. 153, 161-2, 140 S. W. (2d) 13, 16(3); Rischeck v. Lowden, 347 Mo. 426, 430, 147 S. W. (2d) 650, 652(2); State ex rel. Kurn v. Hughes, 348 Mo. 177, 186-7, 153 S. W. (2d) 46, 52-3(7, 8).

railroad track and parallel crossroad at the bottom of the Caulk's Hill road where the upland and the bottom land came together. The photographs, particularly respondent's Ex. 2, showed that when and before deceased had emerged from the highway between the bluffs, the flat land of the river valley was spread out in full view. Granting that Johnson grass was standing on the right of way and hid the railroad track east and west of the crossing (though we doubt whether the evidence of that is substantial, in view of Fehr's testimony and the photographs); and granting further that the "little hump" in the road concealed the railroad rails at a point 50 feet northward (though respondent and her witness Hemsath said they could see the track from that point); yet there in plain view were the four mail boxes serving the intersection of the Caulk's Hill road and the intersecting parallel highway south of the railroad track; there was the high railroad crossing sign which all of respondent's witnesses (on that point) said they could see for 200 feet, and the words on which they could read for 50 feet; and opposite that crossing sign was the telegraph pole carrying across the highway 11 wires which followed the railroad right of way. There, also, was the short railroad bridge over the lateral ditch on the east side of the highway.

The fact that one board of the railroad crossing sign was split, and part of the word "railroad" covered up did not prevent it from serving as a warning (see the photographs). And according to respondent's own expert, Major Peebles, from points 28 and 23 feet north of the crossing the train could be seen westward for, respectively, 211 and 275 feet. It is singular that similar measurements were not taken by respondent from points further north. The corresponding measurements made by appellant's three local witnesses, Bruns, Heitgard and Kolkmeier from points 30 and 25 feet northward, fairly well agreed with Peebles' measurements; and others showed the train could have been seen 103 feet westward from a point 50 feet north of the crossing. · This information was equally available to both parties. And respondent's own testimony showed the brakes of the [849] truck were in good working order; and her brief asserts the deceased could have stopped in 7.4 to 11.5 feet. Further, her witnesses Hemsath, Roth and Ostmann all testified that, knowing the railroad track was there, they "always" or "generally" stopped or drove slowly about even with the X post.

Respondent's counsel argues from the testimony of appellant's witnesses fireman Bagley and farmer Bruns that the truck at undiminished speed would have had time to clear the crossing ahead of the train; but that owing to the swift and silent approach of the train and its sudden appearance, the deceased was confused and endeavored to stop—but too late. Indeed, counsel makes the deduction that deceased may have stopped and was trying to back up. But if that be true, he could not have been confused until the train was

close enough for him to *see* it. The closer the truck was to the track the further the train could be seen. But according to respondent's own expert evidence these furtherest practicable "seeing" distances were 211.5 feet from 28 feet north of the crossing, and 275 feet from 23 feet north of the crossing. Hurriedly estimated distances cannot stand against these measurements on the ground. Lane v. Mo. Pac. Ry. Co., 132 Mo. 1. c. 26, 33 S. W. 1. c. 651-2. Subtracting the 7 foot 9 inch distance of the driver's eyes back of the front of the truck, the latter, in order to *clear* the track, would have had to travel 20 feet 3 inches or 15 feet three inches, plus the width of the track (5 feet), plus the length of the truck (estimated 14 feet), which would have been almost 35 or 40 feet and at undiminished speed the time consumed would have been nearly 1.5 to 2 seconds. The deceased's confusion, stopping and efforts to back up after he saw the train would have extended that time substantially. The train meanwhile would have covered its distance (211.5 or 275 feet) in 3.6 to 4.7 seconds.

Counsel cannot ask us to indulge in these speculations. Neither can he complain that the deceased was deprived of an opportunity to race the train to the crossing. The deceased could see a considerable distance to the east, as respondent's witnesses testified and the photographs show. His duty was to watch mainly the blind or west side of the crossing. He knew, or should have known, for about 200 feet, or at the very least 50 feet, that he was approaching a railroad crossing. He was guilty of contributory negligence if he did not, and further dutybound to have his car under control as respondent's other witnesses say they did when approaching that crossing, since they knew it was there; and this is true even though he may not have seen or heard the train at the time. On this ground we are convinced the judgment should be reversed. It is so ordered.

All concur.

PER CURIAM:—Respondent asks no rehearing, but moves that the cause be remanded instead of reversed outright, in order that it may be tried again on the theory of negligence under the humanitarian doctrine. She stresses Byrne v. Prudential Ins. Co. of America (Mo. Div. 1), 88 S. W. (2d) 344, 347(4), which says (italics ours): "It is the settled practice of appellate procedure that a case should not be reversed for *failure of proof*, without remanding unless the appellate court is convinced that the available essential evidence has been fully presented and that no recovery can be had in any event." Fifteen other recent cases are cited, in a few of which the stumbling block was a mistaken *legal* theory as in Ducoulombier v. Thompson, 343 Mo. 991, 999(2), 124 S. W. (2d) 1105, 1109 and Gibbs v. Gen. Motors Corp. (Div. 1), 350 Mo. 431, 166 S. W.

(2d) 575, 581(9). But most of them are like the Byrne case where the disappointed litigant failed in his proof. One case, White v. Kentling, 345 Mo. 526, 535, 134 S. W. (2d) 39, 45, states the converse, that (italics ours) : "Ordinarily a cause is not reversed without remand for a new trial *except when the facts have been fully developed.*"

But there is no contention in the present motion that the facts were not fully developed below. Such a contention could not be made when it is remembered this is the second of three companion cases for the wrongful death of a mother, child and father, arising out of the same casualty and tried by the same counsel. Each of them was brought on the same assignments of negligence including both primary and humanitarian negligence. In each instance plaintiff presented evidence on all the assignments, and at the close of the evidence abandoned all except failure to sound the statutory warning signals. The hazard of meeting the defense of contributory negligence was obviously greater in this [850] case for the death of the father because he was the driver of the truck, whereas in the two others the mother was a guest and the child too young to be accountable for contributory negligence. But the risk of proceeding under the humanitarian doctrine alone was considerable in all the cases because of the high hill which obstructed the engine crew's view of the approaching truck until it was close to the railroad track. In view of these facts respondent's counsel deliberately chose the primary negligence theory—and we mean no criticism of him in saying that.

But these facts blunt the force of respondent's authorities. In general it can be said they dealt with cases in which the moving party had met with misadventure, perhaps through oversight, misunderstanding or error in legal judgment, but nevertheless misadventure unlike that here where counsel weighed the consequences and committed himself to a particular theory. We have been able to find only a few cases in point on that question. But it is obvious a party should not always be granted a remanding of a cause for successive trials in order that he may experiment with different theories of his adversary's liability. The latter has some rights.

Of the cases decided by this court, the one most nearly in respondent's favor is Yoakum v. Lusk (Mo. Div. 1 ), 223 S. W. 54, 56(5) where it was held (in a wrongful death case) that if the plaintiff has pleaded a substantial ground of negligence, and there is evidence tending to support it, the Supreme Court can on its own motion remand the cause for retrial upon that theory, and has sometimes done so. The opinion stated that "at the trial the plaintiff specifically abandoned all charges of negligence except two." It further discussed a third assignment on which she sought another trial, and held it had no merit.

On the other hand in St. J. Hay & Feed Co. v. Brewster (Mo. App.), 195 S. W. 71, 73(6) it was declared that the ruling of the

lower court awarding plaintiff a new trial will not be upheld on the defendant's appeal, and the cause remanded in order that plaintiff may have an opportunity to meet defendant's successful defense nisi, when neither the defendant nor the trial court had done anything to prevent plaintiff from joining issue on that defense at the first trial, but plaintiff chose to stick to another theory. Conversely, in Robinson v. Unit Iron Co. (Mo. App.), 31 S. W. (2d) 232, where the *trial court* induced the plaintiff to try his case on a wrong theory, to which a demurrer was sustained on appeal, it was held the cause should be remanded.

Outcault Adv. Co. v. Schierbaum (Mo. App.), 209 S. W. 982, 985(9), was an action for the price of advertising novelties. The defendant urged as a complete contractural defense of non-performance that part of the advertising matter furnished was defective, thereby waiving any theory of partial defense and recoupment. Held: the case should not be remanded for new trial to permit the defendant to make the latter defense. And Williams v. St. J. & G. I. Ry. Co. (Mo. App.), 122 S. W. (2d) 118, 124(6) was a suit for personal injuries under the Federal Employers' Liability Act, sustained while plaintiff was installing a grate in a locomotive. Plaintiff recovered judgment which was reversed on appeal on the ground that he had assumed the risk. The appellate court said: "As the fatal facts appear in plaintiff's own evidence we will not remand the cause."

Ritzheimer v. Marshall, 168 S. W. (2d) 159, 166(11, 12) recently decided by the St. Louis Court of Appeals should be noticed. The suit was for personal injuries sustained in an automobile collision. Plaintiff's petition made eight assignments of primary negligence and one under the humanitarian doctrine, but submitted only one assignment—of primary negligence—to the jury. They found for the defendant. The circuit court sustained appellant's motion for new trial on the ground that the verdict was against the weight of the evidence. The defendant appealed, contending the plaintiff was guilty of contributory negligence as a matter of law. The Court of Appeals refused to interfere.

But in so ruling the opinion stated that the plaintiff-respondent had *mistakenly* construed one of the defendant-appellant's assignments on appeal to contend that on a retrial plaintiff could not submit any assignment of negligence she had abandoned at the first trial. Nevertheless the Court of Appeals proceeded to discuss that question for the guidance of the parties in the new trial, and held that on a new trial the plaintiff would be free to submit *any* assignment of negligence—as much as if the case had never been tried before. Then further, by way of illustration, the opinion referred to the doctrine invoked by respondent here—that a cause will not be reversed [851] without remanding "unless the record clearly shows that the facts have

been fully developed and that plaintiff cannot recover in any event.''
Following that the opinion specifically ruled the plaintiff on retrial
could submit her case under the humanitarian doctrine although
she had abandoned it at the first trial.

It is obvious much of this was at least qualified obiter; also that
the Court of Appeals did not hold or mean to hold the process of
remanding a cause for retrial of separate abandoned issues severally
could go on indefinitely. As this decision and others indicate, the
practice is indulged in the interest of *justice*. And undoubtedly
it recognizes that where a party has got the benefit of presenting
his evidence on *all* his pleaded assignments to the jury, and of thereby
impressing their minds with the magnitude of his adversary's dere-
liction; and then deliberately chooses to restrict the submission to
one issue because he believes that is to his advantage—such a course is
more a matter of legal strategy than of misadventure. As an illus-
tration, if a party permits incompetent evidence to go to the jury
without objection or similarly allows an unqualified juror to serve,
gambling on the result, he will not thereafter be heard to complain.

We do not say this is always true of the moral right to a remand
for new trial. The foregoing decisions show the situation will vary
with the facts. The plaintiff may not know on which assignment
he can make the strongest showing—although he can go to the jury
on all of them if he has made a substantial showing on each. But
the instant case was the second of the three cases the respondent
had tried. The verdict in the first was returned on October 24, 1940;
in this case on November 22, 1940, and in the infant's case on De-
cember 13, 1940, the same course being followed in all of them. Aside
from these authorities, respondent's theory of liability in this case,
as stated in her brief, was that the deceased father was driving the
truck at such speed that he could either have beat the train across
the track, or have stopped, *if the statutory signals had been sounded,*
thereby warning him of its approach. She has got two verdicts on
that theory. If the cause were tried under the humanitarian doctrine
this primary negligence would have to be disregarded; and the
recovery would have to be based on the theory that the train crew
could or should have seen the deceased in peril in time to have allowed
him to cross the track or stop *without* the help of the statutory signals
—or she would have to reverse her position and say they were sounded.
Either of these theories would be directly contrary to her theory in
this case. In the circumstances of the case we think it would be
unjust to remand the cause.