Robert Eugene HUPMAN, Respondent,

v.

**MISSOURI–KANSAS–TEXAS RAILROAD COMPANY, a corporation, Appellant.**

No. 24854.

Kansas City Court of Appeals.

Missouri.

June 3, 1968.

Frank J. Rogers, Kansas City, for appellant.

Donald L. Mason, Kansas City, for respondent.

MORGAN, Judge.

This case involves a railroad crossing accident that occurred in Schell City, Missouri, on October 24, 1965. Plaintiff, driver of the automobile that collided with a freight train of defendant Missouri-Kansas-Texas Railroad Company, obtained a judgment in the amount of $2,696.00 for personal injuries after a nine man jury verdict in his favor. Defendant has appealed and contends, (1) that the case should be reversed outright because plaintiff was negligent as a matter of law, and the trial court should have sustained its motion for a directed verdict, or, (2) that the case be reversed and remanded for a new trial for the reason plaintiff's verdict directing Instruction No. 2 implied an obligation of defendant railroad to

sound more warning than is required by Section 389.900 V.A.M.S.

The testimony of the many witnesses can be outlined with more brevity and clarity if we first describe the permanent physical layout of the area surrounding the actual point of collision. County Road AA has an asphalt surface 20 feet wide as it extends in a northerly and southerly direction through Schell City. That portion in the city limits is also called Main Street. For all practical purposes, it is level in the area of interest (1% grade to the north). The defendant's railroad track as it extends generally in a southwesterly and northeasterly direction through the city intersects Route AA. The track at the crossing is at the same level or elevation as AA, and it has a slight decline of 1.65 feet in the first 100 feet southwest of the crossing and 1.35 feet in the next 100 feet. The southwest angle of this crossing of the highway and track (that created by the west edge of AA and the south side of the track) is very acute and measures 21 degrees and 22 minutes. In the vernacular of the military, an automobile going south toward the track would be approached by a train going northeast from a point something less than one o'clock on the dial of a clock. The only point of interest on the east side of AA is a Sinclair Service Station some 330 feet north of the crossing. Some witnesses did refer to the depot and to the other crossings in the city which were generally east and northeast of this service station. On the west side of AA and immediately north of the crossing a gravel street 14 feet wide extends west. There is a dwelling house on the south side of this street some 140 feet west of AA. Further north on the west side of AA, the next building of consequence is a Standard Service Station. The middle of the south drive of the station is 95 feet north of the track, and the middle of the north drive is 170 feet north of the track. Immediately south of the south drive is an ice storage house that is slightly larger than 8 feet by 10 feet. The usual utility poles extend along the west side of AA, and possible temporary obstructions will be considered with the testimony as given.

The plaintiff testified that he was 44 years of age and employed as a truck driver; that he had known the area for over twenty-five years and had owned a cottage nearby for two years; that on this date he was driving a 1961 Chevrolet, owned by his only passenger, in a southerly direction on AA through Schell City; that the automobile was in excellent condition, the side vents were open, the radio was off, and that it was a beautiful fall day—clear and bright; that he was driving 15 to 20 miles per hour and that he first saw the train coming from the southwest when he was 10 or 15 feet from the track; that at that moment the train was 20 or 25 feet from the crossing and traveling 30 to 35 miles per hour. He then " * * * turned hard right. I tried to miss it. I was trying to go down the side of the track or anything to miss the train, but I didn't have time." The left front of the automobile came in contact with the left front of the engine nearly head on. On direct examination, plaintiff described the situation that existed immediately prior to the collision. He said, "Well, we was driving south going through town. I was coming up to the crossing, but you can't see down the track because of a building there, and there is a Standard Station, and it had cars and a few buses, school buses, parked there, and you can't hardly see that track until you are right on it anyway, down it, and when I seen the train we were right on each other." From his later testimony, it appears that a "couple" of the cars were located along the side street south of the station. He also said that weeds started 12 to 15 feet west of AA and extended southwest along the track. His extended testimony was generally consistent with only a slight variation in terminology as it was given on the stand, by deposition or to other persons.

We will first look to what "he saw or heard," and then to what "he did." He testified that he did not hear the crossing bell and heard only one "toot" from the train seconds before the impact. As to the weeds along the track, he was asked: "Did it hide the train?", and answered, "No, not all of it." Again, "And the weeds wouldn't hide the train?" Answer, "No." He did not see the train until he was 10 or 15 feet from the track, and when asked, "Was there anything that prevented you from seeing it, before that?" the answer was "No." We turn now to what he was doing or did as he approached the crossing which he knew was there. One answer was, "Well, we was going to the reserve and I looked up and there was the train, and we hit; as simple as that." Other questions and answers, which we have carefully avoided taking out of context, were:

Q: "Were you looking out for a train?"

A: "No, I wasn't."

Q: "You knew that you were approaching this crossing?"

A: "Yes."

* * *

Q: "Now, you were just looking at the road ahead, is that what you were doing?"

A: "Yes, sir."

Q: "And you didn't look down the tracks for a train?"

A: "You can't see down the tracks until you are on that crossing."

Q: "You didn't look down the track for a train?"

A: "No."

Q: "You knew the tracks were there?"

A: "Why, sure, they come right along the road."

Rosellen Prewett, the passenger, testified that she owned the automobile and it was in perfect condition; that she was sitting straight-ahead and had just commented to plaintiff that it was a beautiful day; that she had seen the Standard Station, the ice house and cars in the yard of the house; that the crossing bell was not ringing, and the noise of the power steering, as plaintiff turned, first attracted her attention; that you couldn't see until you were at the track, and, "No, I didn't look. I just supposed that the bell would be ringing if there was a whistle—or a train"; that there were weeds and parked cars, but agreed they would not hide a diesel engine; that she did not know if plaintiff had looked down the track.

Jewell W. Ditty testified for plaintiff. He was a resident of Schell City and was at the Sinclair Station at the time of the accident. He had heard the crash and turned to the south and saw the automobile facing northeast. He did not hear the crossing bell prior to the crash but heard the train whistle shortly before. In a prepared statement for defendant, he had said, "The warning bell could have been ringing, but I don't remember * * *."

Paulean Garrett had lived within two blocks of the crossing for three years, but at this time was at the Sinclair Station. She testified that sometimes the crossing bell became stuck when a train crossed and continued to ring for extended periods. However, this morning, she did not hear it. She had not noticed the automobile or train, but did look south after the "toot" of the whistle and hearing noise of the crash. She commented, "You have to be on top of the track before you can see a train from that direction out of town."

This concluded plaintiff's case on the issue of liability and the questions presented here do not necessitate a review of the medical evidence.

We turn to that evidence submitted by the defendant. A trooper of the Missouri Highway Patrol had been called to investigate the accident. He recalled plaintiff

had suffered a severe blow in the mouth, but had told him, "I just looked up and, hell, the train was on me," plus the fact the crossing bell was not ringing. He testified there was nothing to obstruct the view to the southwest of a southbound driver at fifty feet north of the crossing, and, "one hundred feet back, there wouldn't be anything yet at that distance to obstruct the view."

Defendant's claim agent identified the pictures of the surrounding area which were taken on March 28, 1966, and it was agreed the foliage could have been different. The signal maintenance supervisor tested the crossing bell the next morning, and it was in working order. Defendant's civil engineer identified the plat of the entire area from which the physical facts have been outlined.

An eighteen year old witness testified that at the time of the accident he was riding a motorcycle on AA and, " * * * I heard a train whistle, and I saw a car headed down the tracks." He said there were no obstructions to the view, but other inconsistent statements in writing had been given plaintiff prior to trial.

Another eye witness was Junior E. Landreth. He had driven a school bus for nine years and had been over the track many times. He lived in Schell City and was also at the Sinclair Station. He watched the automobile driven by plaintiff go south by the station, and he heard the crossing bell and the train whistle (for half a minute). He observed both the train and car as they approached the crossing and commented that from the station you could see a quarter of a mile down the track to the southwest. He did not notice any brake lights come on the car. He observed plaintiff's effort to turn to the right and saw the automobile turned "plumb around." He estimated the weeds along the track to have been knee high on the date of the accident.

Thomas C. Hammond at one time worked for defendant and now was engaged in farming, but worked at the Sinclair Station on Sundays. He first heard the train whistle before plaintiff drove by the station. The crossing bell he heard could have been that for AA or those at other crossings through the city. He saw the automobile swerve but did not see any brake lights.

The fireman described the train as consisting of 72 cars and 4 pulling units approximately 14 feet high. He was riding on the left or north side and saw the automobile 200 feet north of the crossing and when it got to within 20 feet he put the train in "emergency." He said the engineer had been blowing the whistle since the "whistle board" some 1300 feet back from the crossing. After the accident, he walked back to the scene and the crossing bell was ringing. He didn't know if it was ringing before the crash as the diesel makes too much noise to hear it.

The engineer said the headlight was burning and he had been sounding the whistle since passing the whistle marker. He did not know of the automobile until the fireman pulled "emergency." A brakeman saw nothing from the caboose but said the crossing bell was ringing when he got there. The other brakeman gave the same testimony.

■ In approaching defendant's argument that plaintiff was guilty of contributory negligence as a matter of law, we will consider the evidence in a light most favorable to plaintiff and give him the benefit of all favorable inferences thereby created and disregard defendant's evidence unless it aids plaintiff. Zumault v. Wabash Railroad Company, Mo., 302 S.W.2d 861. In doing this we disregard defendant's evidence that the headlight was on, the crossing bell was operating and that the train was whistling. Pipes v. Missouri Pacific Railroad Company, Mo., 338 S.W.2d 30. However, we must consider those facts which plaintiff concedes are true. He testified specifically that he did not look down the track for a train,

and even absent this admission, we would be compelled to so find in view of his other testimony that he continued to keep his eyes on the road. Did plaintiff have a duty to look? Obviously, the answer is yes as shown by the declarations found in practically every railroad crossing case reported. Vol. 24A, Mo.Dig., Railroads, ☞298–353. If we have misinterpreted his testimony and plaintiff meant to convey the impression he had looked, we will search for "any substantial evidence excusing his admitted failure to have seen the train." Allinson v. Missouri-Kansas-Texas Railroad Company, Mo.App., 347 S.W.2d 902.

■ Although the evidence is such that a point of reference might fairly be established much farther north on AA, we will make such "search" from a point 100 feet north of the crossing. In view of the speed plaintiff was driving, we need no mathematical formula to assert that the automobile could have been stopped easily within that distance. From this distance, what could or should he have seen? To find the answer, we have used the plat in evidence and placed a straight edge in the middle of the southbound lane of AA 100 feet north of the crossing. With this point as a fulcrum or hub, we extend the straight edge to the southwest until the interior angle of the west side of AA and the straight edge is 21 degrees and 22 minutes or obviously parallel to the railroad track. The Standard Station, ice house and house along the side road are all to the west and north of this line. The same would be true of the school buses in the location given by plaintiff. This leaves nothing in plaintiff's line of sight but weeds. He testified they did not hide the train and we note this is consistent with other evidence they were knee high on the date of the accident. We can reach no other conclusion but that plaintiff could have seen the train from this point. As stated by our Supreme Court in Lohmann v. Wabash R. Co., 364 Mo. 910, 269 S.W.2d 885, 891, "What may be seen from a certain place under admitted or undisputed conditions and circumstances, and the view or line of sight under such circumstances is a physical fact, clearly and unequivocally demonstrable by photographic evidence. And where physical facts speak with a force which overcomes testimony to the contrary, reasonable minds must accept and follow the physical facts and therefore cannot differ. It has long been the rule in this jurisdiction that where testimony is, beyond any reasonable doubt, contrary to established physical facts or laws and facts of common knowledge, it cannot be accepted as substantial evidence." The same principle would be applicable to the conclusion of both plaintiff and Paulean Garrett that vision was obstructed until a driver was "right on" the track.

■ By argument plaintiff relies primarily on the Zumault case, supra. However, the facts there are clearly distinguishable. In *Zumault* the speed of the train was estimated to be 70 to 100 miles per hour, the crossing was quite narrow to accommodate only a single lane of traffic, the heighth of the weeds was in dispute, there was no showing at what point plaintiff had an unobstructed view, plus the fact there was a possibility the accident had been caused by an "unusual projection" from the train. We have reviewed those cases that have considered whether or not the driver of an automobile can place complete reliance on the railroad giving all statutory warnings at a crossing. Vol 24A, Mo.Dig., Railroads ☞330(4), 346(5). The facts differ in each, but under the facts of this case, we follow the holding in Borrson v. Missouri-Kansas-Texas R. Co., 351 Mo. 229, 172 S.W.2d 835, 846: "But even though the appellant's locomotive engineer failed to give the statutory crossing signals, that did not license the deceased to approach the blind crossing heedlessly, if he knew it was there."

This case falls within that class of cases where plaintiff plainly could have seen the approach of the train. "If a motor vehicle driver, having a clear view down

the railroad track in daylight drives upon the track when by looking could have seen an approaching train, if he obviously failed to look for a train before so driving thereon, is guilty of negligence as a matter of law." (Citing cases) Lohmann v. Wabash R. Co., supra.; Pipes v. Missouri Pacific Railroad Company, Mo., 338 S.W.2d 30; Spector Freight System, Inc. v. Missouri Pacific R. Co., Mo.App., 424 S.W.2d 758.

Under the facts of this case and the authorities cited, we have no alternative but to declare plaintiff was guilty of contributory negligence as a matter of law. So finding, we need not rule on the other point raised.

Judgment for plaintiff is reversed.

All concur.