Gerald WILLIS, Plaintiff-Appellant,

v.

WABASH RAILROAD COMPANY, a Corporation, and Edward F. Murray, Defendants-Respondents.

No. 23919.

Kansas City Court of Appeals.

Missouri.

Feb. 3, 1964.

Keith Martin, Campbell & Clark, Kansas City, for appellant.

John L. Davidson, St. Louis, James H. Ottman, John C. Dods, Kansas City, for respondents.

SPERRY, Commissioner.

This is a suit for damages growing out of personal injuries received by plaintiff, Gerald Willis, when a Plymouth automobile which he was operating, was struck by an engine owned by defendant, Wabash Railroad Company, a Corporation, and being operated by defendant, Edward F. Murray, Wabash's engineer. Plaintiff had a verdict in the amount of $15,000.00 but the court sustained the motion of defendants for judgment in accordance with defendants' motion for directed verdict at the close of all the evidence, and, in the alternative, sustained defendants' motion for a new trial. Plaintiff appeals.

Plaintiff submitted on the issue of failure to give the statutory warning. Defendants contend that no submissible case was made for the reason that plaintiff was guilty of contributory negligence as a matter of law, which issue they submitted. They also contend that plaintiff's instruction No. 8, dealing with contributory negligence, is prejudicially erroneous because it required the jury to find that plaintiff saw the engine, instead of requiring it to find that, in the exercise of the highest degree of care, he saw or could have seen the engine, in time to have avoided the collision.

Plaintiff was, at the time of the collision, 28 years of age and in good physical condition. His eyes and hearing were good. He had left Chillicothe, Missouri, at about 5:45 A.M. on November 12th, 1959, to go goose hunting at Sumner, Missouri. He was operating a 1950 sedan automobile and had checked the car as to tires, brakes, etc., and it was in excellent condition. He was travelling south on a narrow, level, gravelled road when he reached a point five hundred feet north of a crossing over the Wabash Railroad. He had travelled this road the morning before the accident occurred, at about the same time of day, and he knew the railroad and crossing were there. He stated that he knew that a train might pass over the crossing at any time, from either direction. He was then proceeding at a speed of 25 to 30 miles per hour. When from one hundred to one hundred fifty feet from the crossing he slowed to 15 miles per hour. The road was dry, there had been no rain or mist but it was cloudy and foggy, and his car lights were on. The time was then near 7:20 A.M. The road ran north-south and the railroad ran east-west, angling slightly to the north. The tracks ran straight for several hundred feet on either side of the crossing. The train involved in the collision consisted of 37 cars and caboose powered by two diesel engines, and was proceeding westward. The engines were painted light gray and blue. Plaintiff stated that the front of the automobile was struck by the front of the engine, that the car swung around and struck the side of the engine at a point about fifteen feet back of the front; that the car was carried into the guy or guard wires which were stretched between the first two of three guard posts placed along the west side of the travelled portion of the road, north of the railroad track. He stated that, when the train was finally stopped, he counted 5½ cars and caboose east of the crossing; that the accident occurred at about 7:20 A.M.

With reference to the facts and events existing and occurring immediately prior to

the collision, he stated that, after reducing speed to 15 miles per hour, one hundred to one hundred fifty feet north of the crossing, he proceeded to a point eighty five feet from the crossing; that the left window glass of the car was down; that there was no radio in the car; that he looked to the left and saw no train; no light, heard no whistle, bell or diesel horn, nor any sound of a train; that the view to the left was obstructed by trees and brush; that he then looked to the right and neither saw or heard anything; that he maneuvered the car to the right or west side of the road; that, when he was about fifty feet from the tracks he again looked to the left but that the view was still obstructed; that the railroad tracks were ten to fifteen feet higher than the road at that point; that he heard no sound and saw no train light; that he then proceeded to a point twenty five or thirty feet north of the crossing where, normally, he said, one could see to the east along the tracks; that his speed, at that point, was slowed to 8 or 10 miles per hour, (he could have stopped, at that speed, within five to ten feet); that he looked to the left, saw nothing, heard nothing; that he then put the car in second gear and proceeded, going up hill toward the crossing level; that, when fifteen feet from the crossing, he looked to the *right*; that he did not stop until, when he reached a point from three to five feet north of the track, "I caught him out of the corner of my eye", that, that was "the only time I saw him, was after he came above the height of the trees, *they were in foliage* and he was approximately the same color as the *leaves*", and that he applied the brakes and skidded into the engine.

However, plaintiff later said that he did not mean to say that he was from three to five feet north of the track when he first saw the engine, but that he was *travelling* at from three to five miles per hour when he first saw the train; that "I was further back than that, because when I was, oh, probably between fifteen and twenty feet back from the track, was when I looked

over and then this train was coming at me from the left, at that time".

The following then appears of record:

"Q. You were how far back?

"A. About, between probably fifteen and twenty foot at that time.

"Q. Fifteen to twenty feet from the track, and you looked at that time and saw the train to your left?

"A. No, I didn't see him at that—at that time.

"Q. * * * Did you ever see it?

"A. I saw it when it hit me, yes.

"Q. Now where were you when you got that glimpse of him? How far from the tracks?

"A. Oh, I don't know, probably eight to ten foot, or maybe a little further than that.

"Q. All right, and travelling at what speed?

"A. I would say * * * at three to five miles per hour".

Plaintiff stated that, at that time, he applied the brakes as heretofore stated. He also stated that, when he first saw the train, he was still going slightly up grade.

Plaintiff introduced into evidence certain exhibits, pictures of the crossing and of its northern approach. They were received as fairly representative of the situation as it existed there at the time of the collision. Exhibit 9, definitely fails to show the presence of leaves on the trees and brush on the east side of the road, nor along the tracks anywhere. There are no leaves. It shows no shrubbery or trees from a point several feet south of the northern-most of the three guard posts on that side of the road. None between that point and the track. Plaintiff admitted that he could have stopped his car at from five to ten feet, and defendants offered expert testimony to the effect that the car could have been

stopped within from four to seven feet, depending on the grade.

Highway patrolman, Conyers, was notified of the occurrence shortly after 8:00 A.M. He had been using the lights of his car just prior thereto. He arrived at the scene at 8:35 A.M. Judging from the light conditions immediately following the time of the accident, he believed that, at 7:20, it wasn't bright, that it was dusk; that there were trees on both sides of the gravel road, north of the crossing; that he made no measurements to determine how *far* one could see to the east along the tracks, but that one could see down the tracks from a point twenty five to thirty feet north of the tracks.

There was uncontroverted testimony by members of the train crew, offered by defendants, to the effect that the train consisted of 37 cars, a caboose and two diesel engines; that it was travelling at 35 miles per hour. They also stated that visibility was good, that there was no fog, and that it was daylight; that the train made a lot of noise; that the whistle and the crossing bell were being sounded; that the headlight and oscillating light were on; that, after dismounting from the engine, they could see back to the crossing, nine hundred fifty feet, and counted nineteen cars and two diesels, west of the crossing.

■■ In dealing with the issue of contributory negligence, as presented here, we must determine whether there was *any* substantial evidence tending to excuse plaintiff's failure to see the engine in time to have avoided the collision. Hale v. Kansas City Southern Ry. Co., Mo., 363 S.W.2d 542. In arriving at that determination, we will view the evidence in the light most favorable to plaintiff, give him the benefit of all favorable inferences arising therefrom, and disregard defendants' evidence unless it aided plaintiff. It was plaintiff's duty, in approaching the crossing, to exercise the highest degree of care and the issue of his contributory negligence was for the jury if reasonable men would honestly differ upon the issue of whether plaintiff exercised the highest degree of care in the operation of the automobile at the time and place involved. Hale v. Kansas City Southern Ry. Co., supra, 363 S.W.2d 542, 545. It is with the above rules in mind that we have stated the facts as gleaned from the record.

The evidence discloses that plaintiff approached the crossing at a speed of eight to ten miles per hour when twenty five to thirty feet north; that, at that point, he looked to the left where he said, normally, he could see down the track. He said that he heard no sound of whistle, bell or horn, and that he saw no lights which, he said, he could have seen if the train lights had been on, and that he shifted to second gear. He said that it was cloudy and foggy. The patrolman, who arrived more than an hour after the accident occurred but who had received notice of the happening about forty minutes after the occurrence, said that he had had his automobile lights on just prior to having received the notice. He stated in his official report that it was not bright, but was "dusk" at the time the accident occurred. He stated in evidence that he based that part of his report on his knowledge of weather conditions existing where he was at about the time the accident occurred.

For the purpose of this opinion the facts are that plaintiff proceeded toward the tracks from a point twenty five to thirty feet north thereof, in second gear, at a speed of from eight to ten miles per hour, gradually diminishing speed until, at the time of the collision, he was travelling at a speed of from three to five miles per hour; that he first saw the train at a point eight to ten feet north of the track, while his car was still travelling up grade; and that no signals were sounded and no light shown by defendant.

Plaintiff testified to the effect that, at the time he first saw the train, out of the corner of his eye, he could have stopped within from five to ten feet. Applying the most favorable evidence rule, we may say that he could have stopped within ten feet and that

his car was then eight feet from the track. We could not say, as a matter of law, that he could then have stopped within sufficient time to have avoided the accident.

■ Plaintiff knew of the railroad track and could see the cross buck warning sign located there from a point far north of the track. He began looking for a train when he was eighty five feet north of the track. There was testimony by his witness to the effect that one could see down along the track, eastward from the crossing, from a point from twenty five to thirty feet north thereof. Plaintiff stated that "normally" he could have seen to the left, down the track from that point. He counted five and one half cars, (a distance of two hundred twenty feet) east from the crossing, immediately after the collision occurred. There is nothing in his testimony or the other evidence, to indicate that *so far as shrubbery and trees are concerned,* he could not have seen to the left along the track, from twenty five to thirty feet north of the track, and from that point forward to the crossing. His own picture, exhibit 9, also clearly indicates this. However, he gave as his *only* reason for being able to see the train when he did see it, "was after he came above the height of the trees, on the *south* side of the tracks, *they were in foliage* and he was approximately the same color as the *leaves*". Note that he did not mention the cloudy, dusky condition. He said that he saw the engine when it came above the height of the foliage of the trees, or the leaves. The obvious conclusion is that, in the exercise of the highest degree of care, he *could* have seen it before he did see it, had he looked, for plaintiff's own exhibit positively disproves the existence of the only condition which, he said, prevented him from seeing it sooner. When he was thirty feet from the track, the train travelling at 35 miles per hour with the car travelling at 10 miles per hour, the engine would have been about one hundred feet from the crossing. Visibility was not different at the moment he saw the train than it had been when plaintiff was thirty feet north of the crossing. There is no testimony that he looked during his travel along that portion of the road from twenty five to thirty feet north until he reached a point ten feet north of the track, a distance of from fifteen to twenty feet. He didn't say that he was looking when he did see it, only that he caught a glimpse from the corner of his eye. So far as foliage is concerned, he could have seen the train at the point where he said he did look and at any time thereafter. It was his duty to look, and to see the approaching train, if he could have seen it in the exercise of the highest degree of care; and his failure so to do would constitute contributory negligence as a matter of law. Pipes v. Missouri, Pacific Railroad Company, Mo., 338 S.W.2d 30, 35. If it was plainly visible, and if he looked, he is held to have seen it. Pipes v. Missouri Pacific Railroad Company, Supra.

■ If the track was not clearly visible at the point where he looked, (the plaintiff did not say that it was not) it was plaintiff's duty to continue to look until he could see "even up to the crossing". Pipes v. Missouri Pacific Ry. Co., Supra; Borrson v. Missouri-Kansas-Texas R. Co., 351 Mo. 229, 172 S.W.2d 835, 848. But, according to plaintiffs' testimony, he could have seen a train approaching, if one had been there, (and one was there) but for the blending of the leaves and foliage with the color of the engine, until the engine appeared over the top of the foliage of the trees. His own exhibit, which, the Court admitted in evidence on the theory that it depicted the conditions existing there on November 12th, 1959, all trees and shrubbery are completely bare of leaves or foliage of any kind.

The judgment setting aside the verdict and rendering judgment for the defendant is affirmed.

MAUGHMER, C., concurs.

PER CURIAM.

The foregoing opinion of SPERRY, C., is adopted as the opinion of the court. All concur.